2022 CO 35 The People of the State of Colorado, Petitioner In the Interest of Minor Children My. K.M. and Ma. K.M., v. V. K.L. and T.A.M. Respondents No. 21SC245
Supreme Court of Colorado, En Banc
June 27, 2022
 Certiorari to the Colorado Court of Appeals Court of Appeals Case No. 20CA695 
 Attorneys for Petitioners: Kristin M. Bronson, Denver City Attorney Cathleen M. Giovannini, Assistant City Attorney Denver, Colorado 
 Attorneys for Minor Children: Meinster & Associates, P.C. J. Barry Meinster, Guardian ad litem Conifer, Colorado 
 1
 Attorneys for Respondent V.K.L.: Law Offices of Dailey & Pratt, LLC Joel M. Pratt Colorado Springs, Colorado 
 2
 Attorney for Amicus Curiae Colorado Office of Respondent Parents' Counsel: Zaven T. Saroyan Denver, Colorado 
 No appearance on behalf of Respondent T.A.M. 
 3
 OPINION 
 4
 MÁRQUEZ JUSTICE 
 ¶1 This termination of parental rights case concerns the "active efforts" required under the Indian Child Welfare Act ("ICWA") to provide remedial services and rehabilitative programs to assist a parent in completing a court-ordered treatment plan. A division of the court of appeals reversed a juvenile court's judgment terminating Mother's parent-child legal relationship with her two Native American children,[1] holding that the Denver Department of Human Services ("DHS") did not engage in the "active efforts" required under ICWA to assist Mother in completing her court-ordered treatment plan because it did not offer Mother job training or employment assistance, even though Mother struggled to maintain sobriety and disappeared for several months.[2] We must now decide what constitutes "active efforts" under ICWA and whether the 
 5
 resources and rehabilitative services DHS afforded to Mother to complete her treatment plan satisfied that standard.[3] 
 ¶2 We hold that "active efforts" is a heightened standard requiring a greater degree of engagement by agencies like DHS with Native American families than the traditional "reasonable efforts" standard. Agencies must provide a parent with remedial services and resources-such as those listed in 25 C.F.R. § 23.2 (2021)-to complete all of the parent's treatment plan objectives. While an agency's active efforts must be "affirmative, active, thorough, and timely," 25 C.F.R. § 23.2, such efforts also must be "tailored to the facts and circumstances of the case," id., and the agency retains discretion to prioritize certain services and resources to address a parent's and family's most urgent needs to assist parents with completing the court-ordered treatment plan. 
 ¶3 Here, we conclude that the record amply supports the juvenile court's determination that DHS engaged in active efforts to provide Mother with services 
 6
 and programs to attempt to rehabilitate her and reunite the family. Accordingly, we reverse the judgment of the court of appeals and remand the case for the court of appeals to address Mother's remaining appellate contentions. 
 I. Facts and Procedural History 
 ¶4 Given the fact-specific nature of an "active efforts" analysis, which hinges on the resources and services an agency such as DHS provided to a family, we offer a detailed overview of the relevant events in this case. 
 ¶5 In October 2016, Father took twelve-month-old Ma.K.M. to the hospital, where she was intubated and transferred to the pediatric intensive care unit because she was unresponsive, lethargic, and unable to breathe. Medical staff could not confirm the cause of Ma.K.M.'s symptoms but believed that she may have ingested synthetic marijuana. The hospital contacted the police. After interviewing Father, officers conducted a welfare check at the family's home and discovered that five-year-old My.K.M. had been left unattended while Father and Ma.K.M. were at the hospital. Mother's whereabouts were unknown, and she was unreachable by phone. DHS filed a petition in dependency or neglect as to Ma.K.M. and My.K.M. and placed the children in emergency foster care. 
 ¶6 At a temporary custody hearing held on October 7, 2016, Mother informed the juvenile court that she was an enrolled member of the Colville Tribe in 
 7
 Washington.[4] On November 21, the juvenile court adjudicated both children dependent or neglected as to Father. The parties also agreed to a deferred adjudication for Mother, who admitted that the children lacked proper care through no fault of her own and agreed to comply with the juvenile court's terms and conditions.[5] The terms and conditions required Mother, among other things, to complete a substance abuse evaluation and to follow the treatment recommendations. By December 20, DHS had returned both children to Mother. 
 ¶7 By early 2017, a team composed of a DHS caseworker, a Court Appointed Special Advocates ("CASA") volunteer, and a service provider through the Denver Indian Family Resource Center ("DIFRC"), among others, began to assist Mother with achieving her deferred adjudication-agreement objectives and Father 
 8
 with his treatment plan objectives. DHS also approved the family for childcare assistance, but Mother struggled to identify a viable daycare option that the family liked and would accept the childcare assistance benefit. Mother underwent a cognitive evaluation, resulting in recommendations for parenting skills development services that included hands-on learning, substance-abuse monitoring, and domestic-violence education. 
 ¶8 DIFRC had provided the family with culturally relevant, wrap-around services, but in spring 2017, it discontinued services due to the parents' noncompliance. The parents reported feeling that the organization was not a good fit for their family. By summer 2017, DHS connected the family with a new service provider, the Guadalupe Project ("GP"), which provided the family, and Mother individually, with services and support ranging from parenting skills to transportation for Mother and the children. The GP caseworker helped Mother secure suitable daycare to provide the children with structure during the day and enable both parents to work full time. Overall, the GP caseworker reported cooperation and positive improvements in both parents' engagement and the children's development. 
 ¶9 However, for most of 2017, DHS had ongoing concerns about substance abuse for both parents based on positive urinalysis ("UA") results. Mother had a routine UA test positive for cocaine in October 2017 and missed multiple requests 
 9
 from the DHS caseworker for additional UAs.[6] Due to the ongoing concerns over Mother's sobriety, DHS implemented a safety plan to ensure Mother did not have unsupervised time with the children. DHS also moved to revoke Mother's deferred adjudication; the juvenile court granted the request and entered an adjudication against Mother at a hearing on November 21, 2017. The juvenile court adopted the terms and conditions of Mother's deferred adjudication agreement as the terms of her court treatment plan. Those terms provided: 
 
 [Mother] will complete a Signal substance abuse evaluation.
 [Mother] will fully comply with any and all treatment
 recommendations made by the Signal evaluator. . . . [Mother]
 will not miss any scheduled urinalysis; nor . . . provide any
 urinalyses which test as dilute or positive for any
 substances. If group or individual treatment sessions are
 recommended, [Mother] will attend all scheduled sessions.
 
 
 [Mother] . . . will complete a Lifelong evaluation. [Mother]
 will fully comply with any and all treatment recommendations
 made by the Lifelong evaluator.
 
 
 [Mother] . . . will continue working with in-home services .
 . . . [Mother] will cooperate with the services provided,
 attend all appointments, and will comply with any and all
 treatment recommendations.
 
 
 [Mother] . . . will obtain and maintain employment, or
 another legal source of income, which is sufficient to
 provide for herself and her children.
 
 10
 
 [Mother] . . . will maintain stable housing, adequate for
 herself and her children, which is maintained in a safe and
 cleanly manner.
 
 
 [Mother] . . . will cooperate with [DHS], Guardian ad Litem,
 and all treating professionals. [Mother] will allow [DHS] and
 Guardian ad Litem access to her home for scheduled and
 unannounced home visits. [Mother] will maintain, at a
 minimum, monthly contact with the assigned caseworker.
 [Mother] will sign all necessary releases of information.
 
 
 [Mother] . . . will not leave the minor children, [My.K.M.
 and Ma.K.M.], unattended.
 
 ¶10 With the support of service providers, DHS worked with the family to implement various safety plans to limit Mother's unsupervised oversight of the children and to address the children's unexcused absences from school and daycare. This approach assured that the children were always under at least one sober caretaker's supervision. Mother began receiving substance abuse services from a therapist at the Community Alcohol, Drug, Rehabilitation & Education Center ("CADREC"), and the provider reported that Mother engaged effectively in treatment. By April 9, 2018, the juvenile court lifted the supervision restrictions on Mother's time with the children based on her progress with her treatment plan objectives, and specifically with her sobriety. 
 ¶11 Nonetheless, both parents continued to test positive for drugs at various times, raising ongoing substance abuse concerns. Mother tested positive again for cocaine in June 2018. At a July 2018 hearing, the juvenile court ordered the parents to comply with their respective substance abuse treatments and restrictions. DHS 
 11
 continued providing Mother with substance abuse and sobriety support through CADREC while she simultaneously attended daily Cocaine Anonymous meetings as part of her treatment. In September 2018, Mother's CADREC therapist informed the juvenile court that Mother was on a positive trajectory with her substance abuse treatment. 
 ¶12 Unfortunately, things took a negative turn for the family in the fall of that year. In October 2018, Father was charged with domestic violence and assault against Mother. The juvenile court ordered the children to remain in the home with Mother and required that Father not contact the family. Shortly after the domestic violence incident, Mother tested positive for cocaine on October 4 and 5. Mother processed her relapse with her CADREC therapist and admitted on October 16 to using cocaine and alcohol. Mother's therapist increased Mother's treatment level to provide additional support. 
 ¶13 The turning point in this case occurred on November 16, 2018, when Mother failed to pick up the children from school and daycare and could not be located by the police or DHS. DHS placed the children in foster care, where they have remained. Mother contacted the DHS caseworker a few days later to inform her that she had relapsed after she allowed Father back into the home. DHS arranged an intake for Mother with Stepping Stone inpatient program, but she failed to show for the appointment. Mother thereafter missed multiple scheduled visits 
 12
 with the children facilitated by the GP caseworker, including one scheduled on Christmas Eve. After that, Mother ended all substantive communication with DHS and her treatment providers until July 2019, when she reengaged with her caseworker to again request services for her sobriety. 
 ¶14 DHS arranged for an intensive inpatient treatment program for Mother in July 2019. Mother successfully completed the twenty-eight-day program, and the facility recommended that Mother receive outpatient treatment as after-care. Although DHS referred Mother to an outpatient treatment program, Mother failed to follow through with the referral and disappeared, again ending communications with DHS and her support team. 
 ¶15 After several additional months of relapses by Mother, coupled with her failure to meaningfully and consistently engage with the children or social workers, DHS moved to terminate parental rights. Following a seven-day termination hearing between January 2020 and March 2020, the juvenile court terminated Mother's and Father's parent-child legal relationships with Ma.K.M. and My.K.M. The juvenile court heard testimony from Sylvia Gonzalez, the social work intern assigned to the family at GP; Keenan Moore, the DHS social worker assigned to the case from December 2016 to April 2018; Kathy McGirt, the DHS social worker assigned to the case in April 2018; and Buffy Nicholson, the program manager for the Colville Tribe's child welfare program, who testified as an ICWA 
 13
 Qualified Expert Witness. Gonzalez, Moore, and McGirt testified regarding the services and resources provided to the parents to assist them in completing their respective treatment plan objectives and to prevent the breakup of the family. Nicholson‍ testified that the Tribe supported the termination because of the parents' lack of participation. In her professional opinion, allowing the parents to retain custody would likely result in emotional and physical damage to the children. She further testified that the placement of the children in foster care allowed them to remain together, which was a priority for the Tribe, and that efforts to locate an Indian home had not been successful. Notably, Nicholson testified that she believed DHS had made active efforts in the case to engage the parents and keep the family together, and that from the Tribe's perspective, the services provided were culturally appropriate. She noted, "I don't think it's a lack of cultural services being involved or offered; I think it's a lack of willingness [by the parents] to engage." 
 ¶16 The juvenile court found that even though the parents demonstrated good compliance with their respective court treatment plans early in the case, their compliance as of fall 2018 was not successful. The juvenile court also found that throughout the case, DHS had made active efforts as required by ICWA to provide remedial services and rehabilitative support to prevent the breakup of the family, but that the active efforts were not successful. Therefore, the juvenile court 
 14
 concluded that it was in the best interest of the children to terminate Mother's and Father's parental rights. 
 ¶17 The parents appealed the juvenile court's judgment terminating their parent-child legal relationships with the children. As relevant here, Mother asserted that the juvenile court erred in finding that DHS made active efforts to assist her with completing her court-ordered treatment plan, and specifically, to assist her with securing employment. See People in Int. of My.K.M, 2021 COA 33M, ¶ 28, 491 P.3d 495, 502. A division of the court of appeals agreed with Mother and held that DHS had not made active efforts because it did not provide Mother with employment assistance. Id. The division focused on the requirement in Mother's treatment plan that she have a legal form of income to support herself and the children. Id. at ¶ 37, 491 P.3d at 503. Noting Mother's request for job training at a hearing in summer 2017, id. at ¶¶ 38-39, 491 P.3d at 503-04, the division held that there was no support in the record that DHS had provided Mother with employment training, id. at ¶ 40, 491 P.3d at 504. Relying on two out-of-state cases, the division reasoned that "even significant efforts by the department may not satisfy the active efforts requirement if a critical service is overlooked." Id. at ¶ 36, 491 P.3d at 503 (citing Dep't of Hum. Servs. v. D.L.H., 284 P.3d 1233, 1242-43 (Or. Ct. App. 2012); In re Int. of Jamyia M., 791 N.W.2d 343, 349 (Neb. Ct. App. 2010)). Therefore, the division overturned the juvenile court's judgment terminating 
 15
 Mother's parental rights and remanded for further proceedings. My.K.M., ¶ 53, 491 P.3d at 505-06. 
 ¶18 DHS and the children's guardian ad litem jointly petitioned for certiorari review, which we granted. 
 II. Analysis 
 ¶19 We begin by setting forth the applicable standards of review. We next provide an overview of ICWA and address the scope of ICWA's active efforts requirement. We then proceed to address whether DHS engaged in active efforts to provide Mother with remedial services and rehabilitative programs designed to prevent the separation of her family, and we conclude that it did. 
 A. Standard of Review 
 ¶20 Whether DHS satisfied ICWA's active efforts requirement is a mixed question of fact and law. See Walker E. v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs., 480 P.3d 598, 606 (Alaska 2021); In re Dependency of A.L.K., 478 P.3d 63, 68 (Wash. 2020). We review the juvenile court's factual findings for clear error. See C.R.C.P. 52 ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."); People in Int. of A.J.L., 243 P.3d 244, 250 (Colo. 2010) (observing that we set aside a trial court's factual findings "only when they are 'so clearly erroneous as to find no support in the record'" (quoting People in Int. of 
 16
 C.A.K., 652 P.2d 603, 613 (Colo. 1982))). But whether those findings satisfy ICWA's active efforts requirement is a question of law that we review de novo. See Walker E., 480 P.3d at 606; A.L.K., 478 P.3d at 68. We further recognize that, because canons of construction applicable in Native American law are fixed in the unique trust relationship between the United States and tribes, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985). 
 B. ICWA 
 1. ICWA's History and Purpose 
 ¶21 Congress enacted ICWA in response to "an alarmingly high percentage of Indian families broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." 25 U.S.C. § 1901(4); see also Indian Child Welfare Act of 1978, Pub. L. No. 95-608, § 2, 92 Stat. 3069 (1978); 95 Cong. Rec. 37,223-26 (1977) (finding that Native children in cities and reservations were "separated from their natural parents through the actions of nontribal government agencies or private individuals or private agencies and [were] placed in institutions . . . or in foster or adoptive homes, usually with non-Indian families"). Congress emphasized that "[s]tates, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, [had] often failed to recognize the essential 
 17
 tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(5); see also H.R. Rep. No. 95-1386, at 19 (1978) (correlating Native American family separation to "the failure of State officials, agencies, and procedures to take into account the special problems and circumstances of Indian families").[7] 
 ¶22 To end governmental practices of unnecessarily separating Native American families and the vestiges thereof, Congress "establishe[d] federal standards that govern state-court child custody proceedings involving Indian 
 18
 children." Adoptive Couple v. Baby Girl, 570 U.S. 637, 642 (2013). Those standards lay the groundwork for protective measures that "articulate[] a strong [f]ederal policy that, where possible, an Indian child should remain in the Indian community." U.S. Dep't of the Interior, Off. of the Assistant Sec'y, Proposed Regulations for State Courts and Agencies in Indian Child Custody Proceedings 'ICWA Proposed Rule,' 2 (Mar. 20, 2015) (emphasis added), https:// www. bia. gov/sites/bia.gov/files/assets/as-ia/raca/pdf/idc1-030271.pdf [https://perma.cc/3GWJ-TK8W]. 
 ¶23 ICWA requires an agency involved in a child-custody proceeding, like DHS, to satisfy certain requirements to seek termination of parental rights to a Native American child. See 25 U.S.C. § 1912(d). The statute provides: 
 
 Any party seeking to effect a foster care placement of, or
 termination of parental rights to, an Indian child under
 State law shall satisfy the court that active
 efforts have been made to provide remedial services and
 rehabilitative programs designed to prevent the breakup of
 the Indian family and that these efforts have proved
 unsuccessful.
 
 Id. (emphasis added). The statute does not define certain key terms (such as "active efforts"), which has led to "significant variation in applying ICWA's statutory terms and protections." Bureau of Indian Affs., Guidelines for Implementing the Indian Child Welfare Act 6 (Dec. 2016), https://www.bia.gov/ sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf [https://perma.cc/8T6K-KF2S] ("2016 BIA Guidelines"); see also, e.g., Miss. Band 
 19
 of Choctaw Indians v. Holyfield, 490 U.S. 30, 43-46 (1989) (discussing the lack of uniformity with various state courts' interpretations of the term "domicile" as used in ICWA's provisions, contrary to Congress's intent). In response, the United States Department of the Interior ("DOI"), through the Bureau of Indian Affairs ("BIA"), issued federal regulations in June 2016 clarifying provisions and further defining key terms in ICWA. See generally 25 C.F.R. § 23.2. 
 ¶24 The BIA also issued the 2016 BIA Guidelines to aid state courts in their application of ICWA and the 2016 federal regulations. See 2016 BIA Guidelines. The 2016 BIA Guidelines further elaborate on the definitions and notification provisions found in the federal regulations. The federal regulations and the 2016 BIA Guidelines are essential to aiding courts in their interpretation and application of ICWA's provisions, and we embrace them in this opinion. 
 ¶25 In Colorado, the General Assembly first integrated ICWA into the state code in 2002 through section 19-1-126, C.R.S. (2002). See Ch. 217, secs. 1, 3, § 19-1-126, 2002 Colo. Sess. Laws 782, 782-85. Colorado's ICWA-implementing bill emphasized the state's "commitment to consistent application of and compliance with the provision of the federal 'Indian Child Welfare Act,'" finding that "[t]here is nothing more vital to the continued existence and integrity of Indian tribes than their children." Ch. 217, sec. 1, Legislative Declaration, 2002 Colo. Sess. Laws 782, 783. 
 20
 2. Active Efforts and Court Treatment Plans 
 ¶26 A key feature of ICWA is the "active efforts" standard. When a trial court determines that a child who is the subject of a custody proceeding is an Indian child, ICWA imposes specific duties and standards on the parties involved. As relevant here, ICWA requires an agency like DHS seeking to terminate the parental rights to a Native American child to demonstrate that (1) it made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the family, and (2) such efforts were unsuccessful. See 25 U.S.C. § 1912(d). Congress designed the "active efforts" standard "primarily to ensure that services are provided that would permit the Indian child to remain or be reunited with her parents, whenever possible." Indian Child Welfare Act Proceedings, 81 Fed.Reg. 38,778, 38,790 (June 14, 2016). Child-welfare advocates have characterized ICWA's "active efforts" as the "gold standard" of the services that should be provided in child-welfare proceedings. See id. 
 ¶27 However, state courts have grappled with determining the meaning of "active efforts" in Native American child-custody proceedings. See id. at 38,782 ("States are also inconsistent as to how to demonstrate sufficient 'active efforts' to keep a family intact."); State in Int. of C.D., 200 P.3d 194, 205 (Utah Ct. App. 2008) ("The issue of exactly what constitutes 'active efforts' under the ICWA and how this standard relates to the more common reasonable efforts standard has 
 21
 produced a split of authority among the . . . jurisdictions that have considered the issue."). 
 ¶28 As guidance, the 2016 federal regulations now emphasize that "[a]ctive efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 C.F.R. § 23.2 (emphases added). The federal regulations further provide that such efforts must assist parents with satisfying their case plan, should be culturally sensitive, and are to be tailored to the facts and circumstances of a given case: 
 
 [A]ctive efforts must involve assisting the parent or parents
 . . . through the steps of a case plan and with accessing or
 developing the resources necessary to satisfy the case plan.
 To the maximum extent possible, active efforts should be
 provided in a manner consistent with the prevailing social
 and cultural conditions and way of life of the Indian
 child's Tribe and should be conducted in partnership with
 the Indian child and the Indian child's parents, extended
 family members, Indian custodians, and Tribe. Active efforts
 are to be tailored to the facts and circumstances of the case
 . . . .
 
 Id. The federal regulations also include a non-exhaustive list of examples illustrating active efforts: 
 
 (1) Conducting a comprehensive assessment of the
 circumstances of the Indian child's family, with a focus
 on safe reunification as the most desirable goal;
 
 
 (2) Identifying appropriate services and helping the parents
 to overcome barriers, including actively assisting the
 parents in obtaining such services;
 
 
 (3) Identifying, notifying, and inviting representatives of
 the Indian child's Tribe to participate in providing
 support and services to
 
 22
 
 the . . . family and in family team meetings, permanency
 planning, and resolution of placement issues;
 
 
 (4) Conducting or causing to be conducted a diligent search
 for the Indian child's extended family members, and
 contacting and consulting with extended family members to
 provide family structure and support for the Indian child and
 . . . parents;
 
 
 (5) Offering and employing all available and culturally
 appropriate family preservation strategies and facilitating
 the use of remedial and rehabilitative services provided by
 the child's Tribe;
 
 
 (6) Taking steps to keep siblings together whenever possible;
 
 
 (7) Supporting regular visits with parents . . . in the most
 natural setting possible as well as trial home visits of the
 Indian child during any period of removal, consistent with
 the need to ensure the health, safety, and welfare of the
 child;
 
 
 (8) Identifying community resources including housing,
 financial, transportation, mental health, substance abuse,
 and peer support services and actively assisting the Indian
 child's parents or, when appropriate, the child's
 family, in utilizing and accessing those resources;
 
 
 (9) Monitoring progress and participation in services;
 
 
 (10) Considering alternative ways to address the needs of the
 Indian child's parents . . . if the optimum services do
 not exist or are not available;
 
 
 (11) Providing post-reunification services and monitoring.
 
 Id. 
 ¶29 While the 2016 federal regulations have attempted to further define ICWA's "active efforts," courts are still left to determine the practical meaning of the four broad definitional terms used: "affirmative, active, thorough, and timely." 
 23
 25 C.F.R. § 23.2. The federal regulations' definition of active efforts "focuses on what actions are necessary to constitute active efforts" and notably "does not define 'active efforts' in comparison to 'reasonable efforts.'" 81 Fed.Reg. at 38,791. Indeed, DOI intentionally avoided defining "active efforts" by comparison to "reasonable efforts" because ICWA makes no reference to reasonable efforts; rather, that term appears elsewhere in federal law. See id. ("[T]he [DOI] concluded that referencing 'reasonable efforts' [in the final rule] would not promote clarity or consistency, as the term 'reasonable efforts' is not in ICWA and arises from different laws (e.g., the Adoption Assistance and Child Welfare Act . . .)."). 
 ¶30 We first must clarify whether "active efforts" is synonymous with "reasonable efforts." In Colorado, the General Assembly defined "reasonable efforts" based on the federal Adoption and Safe Families Act of 1997. See § 19-3-100.5(2), C.R.S. (2021). That statute provides that: 
 
 '[R]easonable efforts' are deemed to be met when a
 county or city and county provides services in accordance
 with section 19-3-208 [statute providing out-of-home
 placement options for children] and when full consideration
 has been given to the provisions of section 24-34-805(2) [a
 family preservation statute with safeguards for families that
 include a parent with a disability].
 
 § 19-3-100.5(5). Yet, divisions of our court of appeals are split on whether active efforts equate to reasonable efforts. Compare People in Int. of K.D., 155 P.3d 634, 637 (Colo.App. 2007) ("'Active efforts' are equivalent to reasonable efforts to provide or offer a treatment plan in a non-ICWA case."), with People in Int. of T.E.R., 
 24
 2013 COA 73, ¶ 33, 305 P.3d 414, 419 ("The ICWA's active efforts standard requires more than the 'reasonable efforts' standard . . . in non-ICWA cases."). 
 ¶31 Congress crafted the active efforts standard to fix what it deemed as state courts' failure to recognize and address the special needs and circumstances that Native American families face. See H.R. Rep. No. 95-1386, at 19. Logically, a robust standard is required to address the particular challenges that Congress identified in enacting ICWA. Congress's choice of the phrase "active efforts" to describe the standard is therefore notable. Had Congress meant for the standard to equate to "reasonable efforts," it presumably would have used that phrase. But whereas "reasonable efforts" may include passive efforts, the phrase "active efforts" denotes something more; as the federal regulations indicate, such efforts must be affirmative, active, thorough, and timely. See 25 C.F.R. § 23.2. In short, we conclude that the active efforts standard under ICWA is a more demanding standard than the reasonable efforts standard applied in non-ICWA cases. To the extent that K.D., 155 P.3d 634, is inconsistent with our opinion, we overrule it. 
 ¶32 So how should courts measure "active efforts" in a case? The parties in this case agree that the active efforts standard requires DHS to provide a parent with the services necessary to achieve each objective of the treatment plan. Similarly, among state courts that have addressed the active efforts requirement, "there is substantial agreement . . . that active efforts requires more than simply 
 25
 formulating a case plan for the parent of an Indian child." 81 Fed.Reg. at 38,790; see also Walker E., 480 P.3d at 607 ("To engage in 'active efforts,' an agency must help the parent 'through the steps of [the] case plan and with accessing or developing the resources necessary to satisfy the case plan.'" (alteration in original) (quoting Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs., 433 P.3d 1064, 1071 (Alaska 2018))); Matter of Dependency of G.J.A., 489 P.3d 631, 643 (Wash. 2021) ("The Department cannot simply provide a referral and leave the parent to engage with providers and complete services on their own."). We agree that at a minimum, active efforts require an agency like DHS to identify and secure the resources and services parents need to successfully satisfy court treatment plan objectives and support the parents through the treatment plan goals. However, we recognize that there is no one-size-fits-all formula for "active efforts" and that, as federal regulatory guidance indicates, active efforts should be "tailored to the facts and circumstances of the case." 25 C.F.R. § 23.2. 
 ¶33 Courts should analyze an agency's active efforts by considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan. See Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs., 343 P.3d 425, 432 (Alaska 2015). That said, while active efforts must be "affirmative, active, thorough, and timely," because such efforts are to be "tailored to the facts and circumstances of the case," 
 26
 25 C.F.R. § 23.2, agencies like DHS must retain discretion to prioritize certain services or resources to address a family's most pressing needs in a way that will assist the family's overall completion of the treatment plan. 
 ¶34 Part of the agency's discretion may include strategic decisions regarding which treatment plan objective or objectives to address first. Certain treatment plan objectives may naturally present greater urgency over others, especially those objectives directly related to a child's safety and well-being. For example, addressing a parent's sobriety will likely qualify as a top priority in order to provide stability and safety for the parent and child, as well as enable the parent's meaningful engagement with the services and resources necessary to address the other treatment plan objectives. While some parents may be able to work towards satisfying all treatment plan objectives simultaneously, others may struggle with a specific challenge that may require urgent, consistent, and thorough resources to reach a baseline of stability before tackling other objectives. In the latter circumstance, DHS and service providers may actively address the most pressing concerns first and continue working toward addressing the other objectives, if, based on their professional expertise, sequencing those objectives appears to be the most appropriate approach. 
 ¶35 When reviewing whether active efforts have been made, the court's analysis must be open to recognizing that certain services address overlapping objectives 
 27
 or serve as a necessary stepping stone to achieving another objective. For example, obtaining childcare services may not only satisfy the goal of providing safety, care, and early education for a child, but also may be a prerequisite to achieving other goals, such as a parent's employment or educational opportunities. DHS's efforts must be measured holistically rather than in isolation with respect to specific treatment plan objectives. This reading of ICWA comports with canons of interpretation of Native American law by "constru[ing ICWA] liberally in favor of the Indians," Blackfeet Tribe of Indians, 471 U.S. at 766, as it prioritizes the safety and well-being of Native American children and "[t]here is nothing more vital to the continued existence and integrity of Indian tribes than their children," 2002 Colo. Sess. Laws at 783. 
 ¶36 With this legal framework in mind, we turn to the facts presented here. 
 C. Application 
 ¶37 The division reversed the juvenile court's judgment terminating Mother's parental rights based exclusively on Mother's challenge to the sufficiency of the resources she received from DHS to "obtain and maintain employment, or another legal source of income" as part of her treatment plan. However, as discussed above, we examine DHS's active efforts by considering the totality of the circumstances and accounting for all services and resources provided to Mother to ensure the completion of the entire treatment plan. 
 28
 ¶38 We note at the outset that the juvenile court rightly credited both parents with "compliance and success with the treatment plan in the first half of this case." Although not free of setbacks, the record shows that, by 2018, both parents were making great progress with their respective treatment plans with the resources and services provided to them by DHS and the various service providers. Unfortunately, the family's circumstances changed drastically when Father committed domestic violence against Mother in fall 2018. Shortly thereafter, Mother relapsed, failed to pick the children up from school and daycare, and disappeared. The juvenile court appropriately focused its analysis of Mother's noncompliance with the treatment plan during the fifteen to eighteen months that followed. 
 ¶39 True, the juvenile court found that Mother had no job or any other legal source of income or financial stability after the end of 2018 and that, therefore she had not successfully met that treatment plan objective. But the juvenile court did not deem Mother unfit based on her lack of employment or income; rather, the juvenile court was focused on her inability to maintain sobriety and her cessation of nearly all contact with DHS (and all contact with the children) after relapsing in November 2018. 
 ¶40 After her disappearance in November 2018, DHS made multiple attempts to contact Mother and to facilitate visits with the children. For every request Mother 
 29
 made of DHS for substance abuse treatment, DHS responded by securing services, including in-patient treatment for Mother,‍ on multiple occasions. It was clear throughout the case that Mother required substance abuse treatment, and DHS appropriately prioritized the treatment plan objectives with an eye toward successfully completing the whole treatment plan. In this case, both parents exhibited drug abuse, which directly impacted the children's safety, as there was not always at least one sober parent caring for the children at home. Indeed, DHS intervened after Ma.K.M. was hospitalized and intubated because she possibly ingested synthetic marijuana, while My.K.M. was left home alone. The record is clear that the parents' substance abuse and their ability to safely care for the children were pressing concerns for DHS and the service providers. Yet, DHS worked to reunite the children with Mother and to begin services to secure the parents' ability to safely keep the children in the family home. Under the circumstances here, DHS's prioritization of Mother's substance abuse issues appears more than appropriate. 
 ¶41 Indeed, providing Mother with substance abuse treatment, securing daycare for the children, and giving Mother in-home life skills training all contributed toward the overall goal of stabilizing Mother so that she would be able to complete all her treatment plan objectives, including obtaining employment or some other steady source of legal income. Although we recognize that some 
 30
 individuals with substance abuse issues can successfully maintain employment, it does not appear from the record that Mother was in a position to do so at any point in this case, especially after November 2018, when she was struggling both with sobriety and securing stable housing. It also cannot be overlooked that Mother disappeared for long periods of time during this case. It is obviously difficult for an agency to provide services to a parent who cannot be located. 
 ¶42 At oral argument, Mother argued that DHS failed to provide her with employment training services between 2016 and 2018, prior to her disappearance. The record reveals, however, that Mother did receive services related to employment training. The GP caseworker testified at the termination hearing that she provided Mother with life skills training, including how to handle a job interview, and that the family's support team was eager to set up daycare for the children to provide "structure during the day and give the ability to both parents to work full time." Under the circumstances of this case, the fact that Mother did not receive direct employment training services is not dispositive. 
 ¶43 Mother's source of income certainly became a pressing issue following the domestic violence incident, after which the family lost Father's income. For most of the case, Mother pursued Supplemental Security Income benefits with the assistance of the GP service worker; Mother was ultimately denied benefits because she did not meet the eligibility criteria. In fall 2018, before Mother 
 31
 disappeared, DHS provided Mother with additional services to address the new challenges Mother and the children were facing, including financial hardships. DHS assisted Mother with rent payments, for example, to enable her to remain in the home with the children. 
 ¶44 In addition to these (and other) efforts, the record shows that DHS arranged for Mother to receive a cognitive evaluation to determine what services and accommodations would be helpful or necessary (as well as to evaluate her potential job capabilities and eligibility for disability services and benefits); arranged for culturally relevant services from DIFRC (including housing and other resources and services); provided extensive transportation services through GP and caseworkers to take Mother to various appointments and on errands; provided extensive in-home support to allow parents to safely care for the children; and searched for kin placements and ICWA preference tribal placements for the children. 
 ¶45 Given this record, the juvenile court properly determined that DHS "made active efforts as required by [ICWA] to provide remedial services and rehabilitative programs to prevent the breakup of this Native American family" but that those efforts were ultimately unsuccessful. The juvenile court's finding was supported by the Tribe's ICWA Qualified Expert Witness, Nicholson, who testified that, in her opinion, DHS had provided active efforts to engage the 
 32
 parents and to keep the family together. Nicholson further testified that, from the Tribe's perspective, the services DHS provided were appropriate as they "ha[d] provided multiple referrals and different providers to assist the family in various aspects, such as mental health, domestic violence, [and] substance abuse." The juvenile court heavily credited the Tribe's Qualified Expert Witness's opinion, and we defer to that credibility determination. 
 ¶46 Mother argues that a totality-of-the-circumstances analysis of active efforts is contrary to the plain text and purpose of the law. We disagree. Nothing in our opinion excuses an agency from its obligation to address all aspects of a parent's treatment plan. As we have stated, ICWA's "active efforts" requirement is a more demanding standard that entails a comprehensive commitment from agencies like DHS to assist Native American families. However, agencies must retain a degree of discretion in how they actively and efficiently provide resources and services to a parent to successfully complete their entire treatment plan-with the ultimate objective of keeping the Native American family together. 
 ¶47 Here, DHS, with the assistance of the service providers, worked diligently throughout the case to address Mother's treatment plan and, in doing so, appropriately prioritized the family's most urgent needs, including Mother's substance abuse issues. DHS's efforts, when measured in their entirety and in the totality of the circumstances (including the fact of Mother's prolonged 
 33
 disappearances), demonstrated affirmative, active, thorough, and timely efforts to unite and maintain the children with their parents. In sum, the record supports the conclusion that DHS provided Mother with services and programs-including multiple illustrative examples of active efforts listed in 25 C.F.R. § 23.2-to rehabilitate Mother. Unfortunately, those active efforts proved unsuccessful. 
 III. Conclusion 
 ¶48 We conclude that the record establishes that DHS met its burden under ICWA to make active efforts to provide Mother with services and programs to attempt to rehabilitate the parents and reunite the family. Accordingly, we reverse the judgment of the court of appeals with respect to Mother's parental rights and remand the case for the court of appeals to address Mother's remaining appellate contentions. 
 34
 --------- 
 Notes: 
 [1] We use the terms "Native American" or "Indian" in this opinion to refer to people from North America with a political affiliation to an Indigenous Pueblo, Tribe, or Nation. We recognize that some people self-identify as Native American or Indian through their heritage and culture, but are not members of a Pueblo, Tribe, or Nation. 
 [2] The division affirmed the juvenile court's judgment terminating Father's parent-child legal relationship with the children. Father did not seek certiorari review of that ruling. 
 [3] We granted certiorari to review the following issue: 
 
 1. Whether the Court of Appeals erred in its analysis
 of the Indian Child Welfare Act ("ICWA") in
 determining [that the] Department of Human Services
 ("DHS") did not make "active efforts" to
 provide services and programs designed to remediate the
 problems that caused DHS's involvement, rehabilitate
 parents, and prevent the breakup of the Indian
 family.
 
 [4] The juvenile court initially treated this case as an ICWA case based on Mother's enrollment in the Tribe. The Tribe later deemed the children ineligible to enroll because they lacked a sufficient blood quantum, so the juvenile court stopped applying ICWA to this case. However, after DHS reached out in 2019 about the feasibility of the children's permanent placement with Tribe members, the Tribe stated that it considered the children to be members of the Tribe regardless of their enrollment status. On November 6, 2019, based on the Tribe's position, the juvenile court held that there was at least "reason to know," 25 C.F.R. § 23.107(a) (2021), the children may be Indian children for ICWA purposes. At a permanency planning hearing held on December 17, the tribal attorney for the Colville Tribe confirmed that the Tribe considered this an ICWA case. The juvenile court accepted the Tribe's membership finding and applied ICWA to the case. 
 [5] The juvenile court officially approved the deferred adjudication on January 4, 2017, nunc pro tunc to November 21, 2016. 
 [6] At DHS's request, Mother also provided a hair follicle sample, which tested positive for illegal substances. 
 [7] While disturbing, the empirical and anecdotal evidence of the disproportionate separation of Native American families is a vestige of the country's systematic history of separating and displacing Native American children from their families. See generally Bryan Newland, U.S. Dep't of the Interior, Federal Indian Boarding School Initiative Investigative Report 51 (2022) https://www.bia.gov/sites/ default/files/dup/inline-files/bsi_investigative_report_may_2022_508.pdf [https://perma.cc/3J24-RS9G] (quoting S. Comm. on Lab. and Pub. Welfare, Indian Education: A National Tragedy-A National Challenge, S. Rep. No. 91-501, at 12 (1969)) ("Federal Indian boarding schools 'were designed to separate a child from his reservation and family, strip him of his tribal lore and mores, force the complete abandonment of his native language, and prepare him for never again returning to his people.'"); H.R. Rep. No. 95-1386, at 9 ("Federal boarding school and dormitory programs also contribute to the destruction of [the] Indian family."); S. Comm. on Lab. and Pub. Welfare, Indian Education: A National Tragedy-A National Challenge at 12-13 (summarizing the 1928 Meriam Report by the Institute for Government Research as condemning "the [federal government's] practice of taking [Native] children from their homes and placing them in off-reservation boarding schools"); Larry R. Daves, Reconciling Our Past, Colo. Law. 6, 7 (2021) ("Most Native American children who went to the boarding schools were forcefully taken from their families."). 
 ---------