24CA1293 Peo in Interest of HBR 02-27-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1293
El Paso County District Court No. 20JV528
Honorable Robin Chittum, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of H.B.R., a Child,

and Concerning K.B.R.,

Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Román, C.J., and Lum, J., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 27, 2025

---

Kenneth Hodges, County Attorney, Amy Fitch, Assistant Chief Deputy County Attorney, Colorado Springs, Colorado, for Appellee

Jenna L. Mazzucca, Guardian Ad Litem

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant

¶ 1     In this dependency and neglect action, K.B.R. (mother) appeals the judgment terminating her parent-child legal relationship with H.B.R. (the child).  We affirm.

## I.     Background

¶ 2     The El Paso Department of Human Services (the Department) filed a petition in dependency and neglect, alleging that mother's substance use disorder placed the then-newborn child at risk.  The child was adjudicated dependent and neglected, and mother joined the Family Treatment Drug Court program just ten days after the petition was filed.  The child was initially placed with mother but was moved to the maternal aunt one month later because mother had not established sobriety.  Although the first phase of Family Treatment Drug Court is designed to last only thirty days, mother remained at phase one for eight months before being discharged from the program.

¶ 3     The Department first moved to terminate the parent-child legal relationship between mother and the child sixteen months after the petition was filed.  However, the motion was continued, withdrawn, and refiled several times while the juvenile court addressed

parentage and the child's possible eligibility for enrollment in the Chickasaw Nation.

¶ 4 The Department enrolled the child in the Chickasaw Nation and, almost three years after the petition's filing, the Chickasaw Nation intervened in the dependency case. The Department also completed and sent the paperwork necessary to enroll mother in the Chickasaw Nation.

¶ 5 Almost four years after the petition was filed, the juvenile court terminated mother's parental rights following a contested hearing.

## II. Active Efforts

¶ 6 Mother contends that the juvenile court erred by finding that the Department made active efforts, as required by the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-1963, to rehabilitate her after the child was enrolled in the Chickasaw Nation. We disagree.

### A. Preservation

¶ 7 Mother agrees that she did not object, at any time, either before or during the termination hearing, to the services provided by the Department, and did not contend that the Department's efforts did not rise to the active efforts standard. Divisions of this

2

court have addressed unpreserved challenges to the juvenile court's findings related to the statutory criteria for termination. *See People in Interest of S.N-V.*, 300 P.3d 911, 913 (Colo. App. 2011) (holding that a parent's failure to object to services does not bar appellate review of a reasonable efforts finding). The county attorney and the child's guardian ad litem encourage us not to consider the Department's active efforts because no challenge was preserved. But we need not resolve the preservation issue because whether we conclude that mother has failed to preserve her active efforts claim for appellate review or whether we address the issue, the outcome is the same. *See L&R Expl. Venture v. Grynberg*, 271 P.3d 530, 536 (Colo. App. 2011) (declining to resolve an issue where outcome would not change); *People in Interest of R.R.*, 607 P.2d 1013, 1015 n.2 (Colo. App. 1979).

### B.    Relevant Law and Standard of Review

¶ 8     ICWA establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902. In other words, ICWA establishes minimum federal standards for an "Indian

child" involved in a "child custody proceeding."  25 U.S.C. § 1903(1), (4); *People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42, ¶ 2.

¶ 9    A juvenile court may terminate parental rights if it finds that (1) the child was adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time.  § 19-3-604(1)(c), C.R.S. 2024.

¶ 10    In addition, under ICWA, any party seeking to terminate parental rights to an Indian child must show that it made "active efforts" to "provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."  25 U.S.C. § 1912(b).

¶ 11    Active efforts must be "affirmative, active, thorough, and timely," and must be "tailored to the facts and circumstances of the case."  25 C.F.R. § 23.2 (2024).  To analyze an agency's active efforts, the court should consider "the totality of the circumstances and account[] for all services and resources provided to a parent to ensure the completion of the entire treatment plan."  *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.  Thus, a department

4

"retain[s] discretion to prioritize certain services or resources to address a family's most pressing needs in a way that will assist the family's overall completion of the treatment plan."  *Id.*

¶ 12     Federal regulations include a non-exhaustive list of examples illustrating active efforts, including comprehensive assessments; identifying appropriate services and "actively assisting the parents in obtaining such services"; inviting tribal representatives to participate in providing support and services to the family; contacting extended family members; offering culturally appropriate family preservation strategies, supporting regular family time; identifying community resources; and monitoring progress and participation in services.  25 C.F.R. § 23.2.

¶ 13     The active efforts standard does not require an agency to persist in futile efforts.  *People in Interest of T.E.R.*, 2013 COA 73, ¶ 33; *People in Interest of A.V.,* 2012 COA 210, ¶ 12.  A court may consider a parent's unwillingness to participate in treatment or engage with a resource as part of its active efforts inquiry.  *A.V.,* ¶ 12.

¶ 14     Whether the Department satisfied ICWA's active efforts requirement is a mixed question of fact and law.  *My.K.M.,* ¶ 20.  We

review the court's factual findings for clear error; however, whether those findings satisfy ICWA's active efforts requirement is a question of law that we review de novo. *Id.*

## C. Analysis

¶ 15 The juvenile court found that "the Department absolutely carried" mother and provided active efforts to rehabilitate her and reunify the family. In doing so, the court found that the Department:

- held "very frequent" staffings, many in person, for mother's benefit;
- coordinated the many professionals involved including representatives from the Chickasaw Nation;
- facilitated ongoing group text messages among mother and her personal and professional supports;
- provided phones, phone cards, bus passes, gas cards, and attempted to provide funding to repair mother's car;
- made referrals to and attempted to encourage mother's engagement with twelve different substance abuse treatment providers, seven different life skills providers, and eight different family time providers; and

6

- offered to pay for two to three months of rent in a sober living home.

¶ 16  In addition, the juvenile court found that the caseworker personally dedicated his time to mother, "took on the DMV" to get mother a driver's license, helped mother apply for membership in the Chickasaw Nation, and supervised family time when mother was discharged from family time facilities.

¶ 17  Importantly, the juvenile court found that the Department's "active efforts [were] tempered by [mother]'s unwillingness to take . . . advantage of the help that has been offered to her." The court noted that multiple referrals for services can be appropriate because "sometimes a provider just isn't the right fit . . . but there were twelve [substance abuse] providers here. There is a point where it ceases being about the providers, and it becomes about [mother]." The court found that mother was not consistent with providers, did not follow through with recommendations from evaluators, did not attend family time, and "even while this termination has been hanging over her head she couldn't get herself to do what she could to show [the court] what she's trying to do here."

¶ 18    The record supports these findings.  The caseworker testified that, over the nearly four years that the case was open, mother was routinely discharged from substance abuse, mental health, life skills, and family time service providers because of her failure to engage in services, despite consistent and intensive efforts to support her.  The caseworker testified that the Department "r[an] out of different providers within town" that would accept mother for services.  When testimony began for the termination hearing, the caseworker testified that the referral for mother's substance abuse provider at that time had been open for four months.  The caseworker also testified that mother recently made "a few appointments" with that provider, resulting in "one of the longer periods of time [mother] has been engaged."  The termination hearing was continued for three months; when testimony resumed, the caseworker testified that mother had not engaged in further treatment with that provider and was facing discharge.

¶ 19    Furthermore, we determine that these findings satisfy ICWA's active efforts requirements.

¶ 20    Mother claims that the active efforts standard was not met because, during the four years the case was open, "the

8

[D]epartment provided the same efforts regardless of whether ICWA applied and regardless of whether [m]other indicated she needed more or different help." Mother appears to suggest that making referrals for the same kinds of services precludes a finding of active efforts. But a department must develop an appropriate treatment plan to address a parent's needs and may properly prioritize and address a parent's most pressing problems so as to support successful reunification of the family. *Id.* at ¶ 33.

¶ 21    Mother's substance dependence was "the primary concern in this case." To that end, the Department facilitated mother's immediate participation in the Family Treatment Drug Court program, which the caseworker described as "intensive wraparound services" and "basically an active effort" provided before either mother or the child were enrolled in the Chickasaw Nation. When mother was discharged from Family Treatment Drug Court, the Department made referrals to more than a dozen providers offering a wide array of services at many levels to address the primary barrier to reunification: mother's substance dependence. The referrals included crisis services, wraparound services, outpatient substance abuse and mental health, intensive outpatient treatment

programs, inpatient substance abuse and mental health treatment, detox, sober living homes, and independent sobriety monitoring services.

¶ 22    The Department made referrals to services provided in person and online, services that mother requested, and services that were provided by members of the Native American Community.  One Native American-run organization would not accept a referral because it was a nonprofit; in lieu of a referral, the Department and mother's professional team "tried to impress [on mother] that [the service] would be something good for her to do."

¶ 23    In addition to referrals for services, the Department maintained a "pretty intensive team throughout" the case to assist mother with transportation, planning, and crisis management.  One of mother's mental health and substance dependence providers testified that they "offered significant resources" to mother, but mother did not take advantage of those resources.  That provider testified, "we can provide the resources but it's really up to the client to follow through," and mother failed to follow through.  One of mother's life skills providers testified that mother made "a lot of crisis calls for support" when she was first referred to them, but "it

was hard for [life skills] to help her when there was no follow through and she wouldn't show up" to receive help.  That provider, who also attempted to supervise family time for mother, testified that she reached out to mother up to three times a week to support and reengage her, but that mother's lack of sobriety kept her from engaging in services.

¶ 24    The qualified expert witness from the Chickasaw Nation testified that active efforts were "definitely" made by the Department, but there was "an active failure every time on mom's part" to follow through on the services offered to her through her treatment plan.

¶ 25    Given this record, we determine that the Department provided active efforts to mother, which were tempered by mother's failure to engage in the many types of services offered to her.

### D.    Americans With Disabilities Act

¶ 26    Citing only law related to protections against discrimination, mother appears to contend that the juvenile court erred by failing to provide her with accommodations under the Americans with Disabilities Act, its related amendments, and its implementing regulations (the ADA).  *See* § 19-3- 208(2)(g), C.R.S. 2024.

¶ 27 We decline to address any contention under the ADA because mother did not preserve this issue. *T.E.R.*, ¶ 30 (generally, issues not raised in the trial court will not be considered on appeal)

¶ 28 The Department made referrals for, and mother completed, three neuropsychological evaluations over the nearly four years that the dependency and neglect case was open. During a permanency planning hearing, mother requested that the Department make a single case contract with mother's preferred provider for the third neuropsychological evaluation and asserted that she would file a motion under the ADA for any accommodations that might be needed after the evaluation. The third neuropsychological evaluation was completed, but no ADA-related motion was filed. The neuropsychological evaluation is not in the record before us, but the caseworker testified that its results were much like prior reports and did not include recommendations for accommodations under the ADA. The caseworker testified that mother did not make even informal requests for accommodations based on its results.

¶ 29 When a parent is found to be a qualified individual, the juvenile court must consider whether the Department made reasonable accommodations for a parent's disability when

determining whether it made reasonable efforts. *People in Interest of S.K.*, 2019 COA 36, ¶ 34; *see* 42 U.S.C. § 12102 (defining "disability" under the ADA); *see also* 42 U.S.C. § 12131(2) (defining "qualified individual" under the ADA). But mother did not ask the juvenile court to determine whether she was a qualified individual under the ADA and did not request that any accommodation be made for her. Thus, the juvenile court did not have an opportunity to make any specific findings of fact or legal conclusions about the applicability of the ADA, leaving us with nothing to review. *See People in Interest of S.Z.S.*, 2022 COA 133, ¶ 18.

### III.    Disposition

¶ 30    The judgment is affirmed.

CHIEF JUDGE ROMÁN and JUDGE LUM concur.