25CA1085 Peo in Interest of QAL 11-20-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1085
City and County of Denver Juvenile Court No. 22JV30662
Honorable Lisa Gomez, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of Q.A.L., a Child,

and Concerning K.L.L.,

Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE BROWN
Fox and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 20, 2025

---

Miko Brown, City Attorney, Amy J. Packer, Assistant City Attorney, Denver, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parents' Counsel, Chelsea A. Carr, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1        In this dependency or neglect proceeding, K.L.L. (father) appeals the judgment terminating his parent-child legal relationship with Q.A.L. (the child).  We affirm.

I.        Background

¶ 2        The Denver Department of Human Services (the Department) filed a petition in dependency or neglect raising concerns about the child's mother's drug use and ability to care for him.  When the case began, father was incarcerated for life without the possibility of parole and was not actively involved with the child.  Father remained incarcerated throughout the case.

¶ 3        Father disclosed that he was an enrolled member of the Cheyenne and Arapaho Tribes of Oklahoma.  Based on this information, the Department sent notice pursuant to the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963.  The Cheyenne and Arapaho Tribes confirmed that the child was eligible for enrollment.  The court found that the child was an "Indian child" and that ICWA applied to this case.  *See* 25 U.S.C. § 1903(4) (defining "Indian child" for purposes of ICWA).

¶ 4        Following father's no-fault admission, the juvenile court adjudicated the child dependent or neglected and adopted a

treatment plan for father. Father's treatment plan required him to work with the Department to schedule and attend regular parenting time, refrain from engaging in further criminal activity, and maintain a working relationship with the Department.

¶ 5 Thirteen months later, the Department moved to terminate father's parental rights, and father moved for a finding that the Department failed to make active efforts. The juvenile court held a contested hearing addressing both motions. But after maternal great-grandmother testified that she had Apache heritage, the court held its order in abeyance until additional ICWA notice could be sent. Almost a year after the contested termination hearing, the juvenile court issued its order finding that the Department made active efforts, granting the Department's motion, and terminating father's parental rights.

## II.    Active Efforts

¶ 6 Father's sole contention on appeal is that the juvenile court erred by finding that the Department made active efforts to prevent the breakup of the Indian family as required by ICWA. We disagree.

## A. Applicable Law and Standard of Review

¶ 7 ICWA establishes "minimum Federal standards" for an "Indian child" involved in a "child custody proceeding." 25 U.S.C. §§ 1902, 1903(1), (4); *People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42, ¶ 2. Under ICWA, any party seeking termination of parental rights to an Indian child must "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). Active efforts require "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with [their] family." 25 C.F.R. § 23.2 (2025). Federal regulations include nonexhaustive examples of active efforts, including identifying and actively assisting the parents in obtaining appropriate services; inviting tribal representatives to participate in providing support and services to the family; contacting extended family members; offering culturally appropriate family preservation strategies; supporting regular family time; identifying community resources; and monitoring progress and participation in services. *Id.*

¶ 8    Still, "there is no one-size-fits-all formula," and active efforts "should be 'tailored to the facts and circumstances of the case.'" *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 32 (quoting 25 C.F.R. § 23.2).  As a result, a department has "discretion to prioritize certain services or resources to address a family's most pressing needs in a way that will assist the family's overall completion of the treatment plan."  *Id.* at ¶ 33.

¶ 9    To that end, "[c]ourts should analyze an agency's active efforts by considering the totality of the circumstances and accounting for all services and resources provided to a parent" and measure the department's efforts "holistically rather than in isolation with respect to specific treatment plan objectives."  *Id.* at ¶¶ 33-35.  The active efforts standard does not require an agency to persist in futile efforts.  *People in Interest of T.E.R.*, 2013 COA 73, ¶ 33; *People in Interest of A.V.*, 2012 COA 210, ¶ 12.  And a court may consider a parent's unwillingness to participate in treatment or engage with a resource as part of its active efforts inquiry.  *A.V.*, ¶ 12.

¶ 10   Whether a department satisfied ICWA's active efforts requirement presents a mixed question of fact and law.  *My.K.M.*, ¶ 20.  We review the juvenile court's factual findings for clear error

but review de novo whether those factual findings satisfy ICWA's active efforts requirement. *Id.*

## B.    Analysis

¶ 11    The juvenile court concluded that the Department made active efforts but that the efforts were ultimately unsuccessful. The court found that the Department made parenting time referrals for father but the rules and limitations of the prison facilities, along with father's mid-case facility transfer, were barriers to the Department's ability to establish family time.

¶ 12    The record supports these findings. The caseworker testified that she started the process to make a family time referral, but she needed father's prison case manager's information before it could be submitted. While the caseworker tried to get that information, father was transferred to a different facility. The new facility required a court order for family time. And the caseworker still needed father's new case manager's information before she could submit a family time referral — the information provided by father's counsel was incorrect. Once the caseworker obtained the correct contact information, she submitted the referral for family time. She

also called and left voicemails for father's case manager but received no response.

¶ 13     Approximately two months later, the caseworker received a call from a family time facilitator indicating that he had been assigned to the case. The caseworker continued to follow-up with the facilitator, as well as the Department's services navigator, regarding the status of family time. Ultimately, due to a lack of communication from the prison facility, the family time facilitator was unable to establish family time for father. During this time, the caseworker also tried to communicate with the prison but, despite leaving multiple voicemails, never received a return call.

¶ 14     The tribal representative from the Cheyenne and Arapaho Tribes, designated by the court as an ICWA qualified expert witness (QEW), testified that the caseworker engaged in efforts to set up family time for father, there was not more the caseworker should have done, and there were no other active efforts the Department should have made. *See id.* at ¶ 45 (affirming the juvenile court's decision that a department made active efforts and relying, in part, on the QEW's opinion that the department had made active efforts).

¶ 15 Even so, father asserts that the juvenile court erred because the caseworker (1) waited thirteen months before submitting the family time referral; (2) waited three more months to reach out to the family time facilitator; and (3) neglected to explore other ways to connect father and the child before the termination hearing. In support of his argument, father references the QEW's testimony that it should not take thirteen months to submit a family time referral when active efforts are required.

¶ 16 True, the record reflects that the family time referral was not formally submitted until thirteen months into the case. But as described above, the caseworker engaged in efforts to establish family time during those thirteen months. And when the QEW's statement is examined in context, it is clear that she was not criticizing the caseworker's efforts in this case. The QEW confirmed that, under the circumstances, she believed the Department made active efforts even though the family time referral was delayed. *See id.* at ¶¶ 33, 35.

¶ 17 Additionally, as described above, once the caseworker obtained the family time facilitator's information, she remained in contact to assess the progress of family time. The QEW opined that

the caseworker engaged in active efforts by submitting the family time referral and following up multiple times. The caseworker also attempted to communicate directly with the prison but never received a response. It is unclear how father expected the caseworker to arrange alternative family time when she was unable to connect with the facility despite these efforts.

¶ 18 Father next claims that the Department's efforts were insufficient because the caseworker's communication with him was limited. Had the caseworker communicated more, father contends, "she would have been able to facilitate visitation and the rebuilding of [f]ather's bond with [the child]." However, when a lack of communication from the prison impeded family time, it is unclear to us how additional communication with father would have facilitated family time. And even though father had the placement's phone number and address, he never called her to speak to the child before the termination hearing. *See A.V.*, ¶ 12.

¶ 19 Finally, we reject father's contention that the juvenile court erred by not reopening the case. Father asserts that, before issuing its order, the juvenile court should have required additional evidence regarding the Department's efforts during the year the

case remained open following the termination hearing. But father never made this request of the juvenile court, so this issue is not preserved. *See People in Interest of V.W.*, 958 P.2d 1132, 1134 (Colo. App. 1998) (declining to address an argument raised for the first time on appeal); *see also Berra v. Springer & Steinberg, P.C.*, 251 P.3d 567, 570 (Colo. App. 2010) (to "properly" preserve an argument, the party must have "presented to the trial court the sum and substance of the argument it now makes on appeal").

¶ 20    Furthermore, even if father's argument was preserved, we see no error. Essentially father contends that, if the juvenile court had taken testimony about the "changes" that occurred after the termination hearing — referring to his "semi-regular" calls with the child through the placement provider — the court's concerns about his lack of contact with the child may have been alleviated and the court "may have concluded that a less drastic alternative to termination existed." But father's lack of contact with the child was only one factor the court considered when finding that there was no less drastic alternative to termination. The court also found it "not highly probable" that an allocation of parental responsibilities (APR) could provide the level of stability and consistency that the child

9

needed and noted that the placement would not accept an APR. *See People in Interest of T.E.M.*, 124 P.3d 905, 910 (Colo. App. 2005) ("[L]ong-term or permanent placement may not be appropriate when it does not provide adequate permanence or otherwise meet the child's needs."); *People in Interest of P.D.*, 580 P.2d 836, 838 (Colo. App. 1978) (holding that a court cannot enter an APR to an unwilling party who is not the child's parent). And father does not contest these findings. Because the record supports the juvenile court's finding that there was no less drastic alternative to termination, we cannot disturb it. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

¶ 21 Considering the totality of the circumstances, we conclude that the juvenile court did not err by determining that the Department's efforts met the active efforts standard. *See My.K.M.*, ¶¶ 33, 47. Thus, we decline to disturb the court's judgment.

## III. Disposition

¶ 22 The judgment is affirmed.

JUDGE FOX and JUDGE MEIRINK concur.