24CA0813 Peo in Interest of LQ 02-13-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0813
Weld County District Court No. 22JV12
Honorable Anita J. Crowther, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of L.Q., a Child,

and Concerning R.Q. and C.R.H.,

Appellants.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE YUN
Harris and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 13, 2025

---

Bruce T. Barker, County Attorney, David S. Anderson, Assistant County Attorney, Greeley, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant R.Q.

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant C.R.H.

¶ 1     In this dependency and neglect proceeding, R.Q. (father) and C.R.H. (mother) appeal the judgment terminating their parent-child legal relationships with L.Q. (the child).  We affirm.

## I.     Background

¶ 2     In January 2022, the Weld County Department of Human Services (the Department) filed a petition in dependency and neglect concerning the then-newborn child.  At the time of filing, the Department did not know the identity of the child's father.  The Department alleged concerns about mother's substance use because the child tested positive for benzodiazepines and methadone at birth.

¶ 3     Initially, the juvenile court granted temporary legal custody to mother's stepfather, and the Department placed the child with him.  But a few weeks later, he informed the Department that he was no longer able to care for the child, prompting the juvenile court to grant temporary legal custody to the Department.  The Department then placed the child in foster care for approximately five months before placing her with her paternal uncle and aunt.

¶ 4     When father was confirmed to be the child's biological father through genetic testing, the juvenile court adjudicated him as the

child's legal father. Both parents agreed to deferred adjudications, which required that they comply with court-approved treatment plans. The court later revoked the deferred adjudications and adjudicated the child dependent or neglected.

¶ 5 The Department then filed a motion to terminate the parents' legal relationships with the child. Approximately two years after the petition was filed, the juvenile court granted the termination motion following a contested hearing.

## II. Reasonable Efforts

¶ 6 Both parents contend that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate them and reunify their family. We disagree.

### A. Standard of Review and Preservation

¶ 7 Whether the Department satisfied its obligation to make reasonable efforts is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. Therefore, we review the juvenile court's factual findings for clear error but review de novo its legal determination that the Department made reasonable efforts to rehabilitate the parents. *Id.*

2

¶ 8     The guardian ad litem contends that the parents' reasonable efforts claims are unpreserved because they waited until the "eve of termination" to raise them. And divisions of this court are split on whether a parent must challenge a department's reasonable efforts prior to the termination hearing to preserve the issue for appellate review. *Compare People in Interest of S.N-V.*, 300 P.3d 911, 916 (Colo. App. 2011) (holding that a parent's failure to object to services does not bar appellate review of a reasonable efforts finding), *with People in Interest of D.P.*, 160 P.3d 351, 355-56 (Colo. App. 2007) (declining to review a reasonable efforts finding because the parent failed to object to services provided before the termination hearing).

¶ 9     However, we need not determine whether the parents preserved their reasonable efforts claims because even if we assume that they did, we discern no basis for reversal.

### B.     Applicable Law

¶ 10    The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not

3

been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 11 To determine whether a parent is unfit, the juvenile court must consider whether the department of human services made reasonable efforts to rehabilitate the parent and reunite the family. *See* §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2024; *S.N-V.*, 300 P.3d at 911. "Reasonable efforts" means the "exercise of diligence and care" for children who are in out-of-home placement. § 19-1-103(114), C.R.S. 2024. Services provided in accordance with section 19-3-208, C.R.S. 2024, satisfy the reasonable efforts standard. § 19-1-103(114).

¶ 12 Under section 19-3-208, a department must provide screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information about and referral services to available public and private assistance resources; family time services; and placement services. § 19-3-208(2)(b). And if funding is available, section 19-3-208 requires a department to provide services such as transportation; diagnostic and mental health services; and drug

and alcohol treatment services. § 19-3-208(2)(d). However, services must be provided only if they are determined to be necessary and appropriate based on the individual case plan. § 19-3-208(2)(b), (d).

¶ 13 In determining whether a department made reasonable efforts, a juvenile court should consider the totality of the circumstances and account for all services and resources provided to a parent, measuring them holistically rather than in isolation with respect to specific treatment plan objectives. *See People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶¶ 33, 35.

¶ 14 A parent is ultimately responsible for using the services to obtain the assistance needed to comply with their treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). When a parent voluntarily chooses not to participate in a proceeding and cannot be located, a department need not persist with futile efforts. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12.

## C. Analysis

¶ 15 In evaluating whether the Department made reasonable efforts to rehabilitate the parents, the juvenile court found that throughout the case, the parents were "in and out of [the] custody of multiple

county jails," which made it difficult for the Department to stay in contact with them, particularly when they were out of custody. Despite these challenges, the court found that the caseworker tried to contact the parents through various means, including text messages, phone calls, emails, and letters. The court found that the caseworker was able to make some referrals when she was able to contact the parents. And the court found that the caseworker attempted to set up family time by communicating with the various jails and facilities when the parents were in custody and by making referrals when they were out of custody. Ultimately, the court concluded that the Department made "reasonable efforts as it was appropriate in this case," but that those efforts were not successful in rehabilitating the parents.

¶ 16 The record supports these findings. The caseworker testified that when father was not in custody, he did not communicate with her, despite her attempts to reach out to him in various ways. Similarly, there were times when mother was out of custody, and the caseworker could not get ahold of her and did not know where she was. The caseworker was unable to submit referrals for

services when she did not know where the parents were or when they were not in communication with her.

¶ 17 Still, the caseworker referred both parents for integrated evaluations and sobriety monitoring. Father did not complete his evaluation until about a month before the termination hearing. By the time of the hearing, the caseworker was still waiting to receive the evaluation recommendations, which would have helped her determine whether father needed additional service referrals. And although mother completed her evaluation about a year after the case was filed, she attended only one of the recommended therapy sessions afterward.

¶ 18 The caseworker also testified that at the beginning of the case, father did not communicate with her, so she could not make any family time referrals. Then, when father was in the Adams County jail, she reached out to see whether she could arrange family time, but father did not have visitation privileges. Once father became eligible for visits, the caseworker attempted to schedule them, but the jail's billing system caused delays. When father was released to a halfway house, the caseworker contacted the halfway house to set up family time, but father was not initially allowed to have visits.

The caseworker followed up every month, and when father was allowed to have visits, she worked on setting up family time that would be supervised by the paternal uncle. When the paternal uncle decided he was unwilling to supervise, the caseworker made a referral for supervised family time, and father had a visit with the child before the termination hearing.

¶ 19    For mother, when she was initially in custody, the caseworker contacted the jail to see whether she could set up family time and submitted the paperwork to do so. Shortly after that, mother was transferred to a different facility, which required the caseworker to restart the paperwork, leading to some delays. When mother was not in custody, the caseworker made four different referrals for supervised family time, but mother was discharged from the family time providers due to her lack of engagement. By the time of the termination hearing, the caseworker had set up weekly virtual family time for mother at the Boulder County jail.

¶ 20    We disagree with father's argument that the Department failed to make reasonable efforts because the caseworker did not make referrals for services or family time while he was in custody. The caseworker testified that she did not make any service referrals

while father was in jail because the jail did not allow service providers to go into the facility. And as noted above, the caseworker reached out to the jail to try to arrange family time, but she was informed that father did not have visitation privileges. Moreover, the court properly considered the efforts made throughout the case — when father was both in and out of custody — in evaluating whether the Department met its reasonable efforts obligation. *See My.K.M.*, ¶¶ 33, 35 (stating that a juvenile court's determination of whether a department made reasonable efforts must be based on the totality of the circumstances).

¶ 21 We also reject mother's argument that the Department failed to make reasonable efforts because the caseworker did not have monthly, in-person meetings with her while she was in custody, as required under the Social Service Rules (Volume 7). *See* Dep't of Hum. Servs. Reg. 7.204(B)(1), 12 Code Colo. Regs. 2509-3. Although we acknowledge that the Department is expected to follow its own regulations, we note that nothing in section 19-3-208 requires a specific number of outreach efforts or contacts with a parent each month to satisfy the Department's reasonable efforts obligation. And the juvenile court's determination of whether the

9

Department made reasonable efforts must be guided by the Children's Code, rather than Volume 7. *See* §§ 19-1-103(114), 19-3-208. We do not suggest that the Department has no obligation to conduct outreach or contact a parent to ensure that the parent receives appropriate services and support. But here, the caseworker testified that she had several in-person meetings with mother throughout the case, and that she reached out to mother via phone, text message, and letters on numerous other occasions. Thus, we are not persuaded that the caseworker's failure to conduct monthly, in-person meetings with mother constituted a lack of reasonable efforts.

¶ 22 Mother also asserts that the caseworker failed to verify her participation in therapy and other services at the Boulder County jail. But she does not provide any legal authority stating that a caseworker must verify a parent's engagement in services while in jail to meet the Department's reasonable efforts obligation. And here, such verification would not have made a difference because no one claimed that mother was not engaged in therapy and other services at the Boulder County jail by the time of the termination

hearing. In fact, the caseworker testified that mother told her she was engaged in therapy and other services through the jail.

¶ 23 We also reject mother's argument that the Department failed to meet its reasonable efforts obligation by not providing her with family time, housing assistance, or transportation. First, as noted above, when mother was in custody, the caseworker attempted to set up family time by working with the various facilities where mother was located. And when mother was released from custody, the caseworker made several referrals for supervised family time. Second, when mother was out of custody, the caseworker offered to submit a request for funds to help her obtain housing, but mother never provided the required documentation requested by the caseworker. Third, it is true that the caseworker admitted that she was aware of mother's transportation issues in January and February 2023 because mother missed some family time sessions due to a lack of transportation. At that time, the caseworker talked to mother about obtaining a driver's license. But by March 2023, the caseworker did not know mother's whereabouts, making it impossible for her to determine whether mother still needed transportation assistance. Then, in April 2023, mother resumed

communication with the caseworker and attended eight of ten family time sessions without having transportation problems. And nothing in the record indicates that mother continued to need transportation assistance thereafter. *See* § 19-3-208(2)(d) (transportation is only required if it is determined to be necessary and appropriate).

¶ 24 Based on all of this, we do not perceive any error in the juvenile court's determination that the Department made reasonable efforts to rehabilitate the parents.

### III. Fit Within a Reasonable Time

¶ 25 Father contends that the juvenile court erred by determining that he could not become fit within a reasonable time. We are not persuaded.

### A. Applicable Law and Standard of Review

¶ 26 A parent is unfit if they are unable or unwilling to give a child reasonable parental care. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 23. "Reasonable parental care requires, at a minimum, that the parent provide nurturing and protection adequate to meet the child's physical, emotional, and mental health needs." *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 9.

¶ 27    A parent must have a reasonable amount of time to work on a treatment plan before the juvenile court terminates their parental rights. *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App. 2007). The determination of a reasonable period is necessarily fact specific, and what constitutes a reasonable time to comply with a treatment plan may vary from case to case. *Id.* But a reasonable time is not an indefinite time, and it must be determined by considering the physical, mental, and emotional conditions and needs of the child. *S.Z.S.*, ¶ 24. Periods as short as five to nine months have been held to be sufficient to comply with a treatment plan. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).

¶ 28    When, as in this case, a child is under six years old at the time the petition in dependency and neglect is filed, the juvenile court must consider the expedited permanency planning (EPP) provisions, which require that such children be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2024; *see also S.Z.S.*, ¶-25.

¶ 29    We review the court's factual findings related to the termination of parental rights for clear error, but we review de novo

13

the court's legal conclusions based on those facts. *S.R.N.J-S.*, ¶ 10. Further, the credibility of the witnesses, the sufficiency, probative effect, and weight of the evidence, and the inferences and conclusions to be drawn from the evidence are within the province of the juvenile court. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

## B. Analysis

¶ 30 Father contends that he was likely to become fit within a reasonable amount of time because, by the date of the termination hearing, he was sober, employed, and in substantial compliance with his treatment plan. But even though the caseworker testified that father was sober, employed, and had "made significant progress in this treatment plan," the juvenile court still found that father was unable to meet the child's needs and that his condition was unlikely to change within a reasonable amount of time. Specifically, the court noted that this EPP case had been open for approximately two years, which constituted the majority of the child's life. The court then found that the child needed permanency and that it remained "unclear on how much longer" it would take father to become fit.

¶ 31    These findings are supported by the record.  By the time of the termination hearing, the child had been out of the home for her entire life.  The caseworker testified that although father was doing well in the halfway house, the child could not live with him there, and father was unsure of when he would be released.  The caseworker testified that there were still "many things that would have to happen" before returning the child to father would be an option.  Specifically, she stated that father would need to maintain stable employment, secure housing that was safe for the child, and demonstrate ongoing sobriety, as he had never completed any sobriety testing when not "under the threat of incarceration for not doing so."  Although the caseworker could not estimate the amount of time it would take for father to become fit, she did not believe that, considering the child's needs, it would be a reasonable amount of time.

¶ 32    In sum, the juvenile court concluded that father could not become fit within a reasonable time.  The court made this determination after considering the evidence showing father's partial compliance with his treatment plan and weighing it against the contrary evidence and the child's needs.  Because the record

supports the court's findings, we will not disturb the judgment. *See People in Interest of K.L.W.*, 2021 COA 56, ¶ 62 (we do not reweigh the evidence or substitute our judgment for that of the juvenile court).

## IV. Less Drastic Alternatives

¶ 33 Mother contends that the juvenile court erred by finding that termination was in the child's best interests when there was a less drastic alternative available in the form of an allocation of parental responsibilities (APR) to the child's paternal uncle and aunt. We discern no error.

## A. Applicable Law and Standard of Review

¶ 34 The consideration and elimination of less drastic alternatives are implicit in the statutory criteria for termination. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 40. In considering less drastic alternatives, a juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *People in Interest of Z.M.*, 2020 COA 3M, ¶ 29. A juvenile court may also consider other factors, including whether an ongoing relationship with a parent would be beneficial to the child, which is influenced by a parent's fitness to care for the

child's needs. *People in Interest of A.R.*, 2012 COA 195M, ¶ 38. And a juvenile court may consider whether the placement provider favors adoption over an APR. *Z.M.,* ¶ 31.

¶ 35    For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, the less drastic alternative must be the "best" option for the child. *A.M.,* ¶ 27. Long-term or permanent placement with a family member or foster family, short of termination, may not be a viable less drastic alternative if it does not provide adequate permanence that adoption would provide or otherwise meet a child's needs. *A.R.,* ¶ 41. If a juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *A.M.,* ¶ 32.

¶ 36    "We review a juvenile court's less drastic alternatives findings for clear error." *People in Interest of E.W.*, 2022 COA 12, ¶ 34. Accordingly, when a juvenile court considers a less drastic alternative but instead finds that termination is in the child's best interests, we are bound to affirm the court's decision so long as the

record supports its findings. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B. Analysis

¶ 37 We disagree with mother's argument that the juvenile court "gave virtually no consideration to less drastic alternatives" and "overlooked" the question of whether a less drastic alternative existed. It is true, as mother points out, that the county attorney asked the court whether it had addressed less drastic alternatives after the court delivered its oral ruling. But contrary to mother's assertion, the court had addressed the issue in its ruling, specifically finding that there was "no alternative short of terminating the parent-child relationship that [would have] adequately serve[d] the best interest[s] of the child." And the record supports this finding.

¶ 38 The caseworker opined that an APR was not in the child's best interests because the child needed consistency, and no APR order could ensure the parents would maintain consistent communication or stay out of jail. Thus, we disagree with mother's assertion that there was nothing in the record to indicate that an APR would create instability or be against the child's best interests.

18

¶ 39     Further, the caseworker testified that she discussed various permanency options with the paternal uncle and aunt, who preferred termination and eventual adoption over an APR. Contrary to mother's argument, the fact that the paternal uncle and aunt likely would not have relinquished custody if an APR had been entered did not, on its own, require the court to find that an APR was a viable less drastic alternative. Rather, in assessing whether an APR was viable, the court properly considered other factors, such as the child's need for consistency and permanency, in conjunction with the paternal uncle and aunt's preference for adoption. *See Z.M.*, ¶ 29 (in considering less drastic alternatives, a juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs).

¶ 40     Accordingly, we hold that the juvenile court did not err by finding that termination, rather than an APR, was in the child's best interests. *See B.H.*, ¶ 80.

## V.     Disposition

¶ 41     The judgment is affirmed.

JUDGE HARRIS and JUDGE KUHN concur.