24CA2165 Peo in Interest of ZH 06-05-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA2165
Mesa County District Court No. 22JV117
Honorable Matthew D. Barrett, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of Z.H., a Child,

and Concerning D.M.,

Appellant.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE MOULTRIE
Lipinsky and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 5, 2025

---

Todd M. Starr, County Attorney, Brad Junge, Assistant County Attorney, Grand Junction, Colorado, for Appellee

Josie Burt, Guardian Ad Litem

Beth Padilla, Office of Respondent Parents' Counsel, Durango, Colorado, for Appellant

¶ 1     D.M. (mother) appeals the judgment terminating her parent-child legal relationship with Z.H. (the child).  We affirm.

## I.     Background

¶ 2     The Mesa County Department of Human Services (the Department) filed a petition in dependency or neglect based on concerns about mother's substance use and the child lacking proper parental care.  The then-one-year-old child was placed into foster care, where she remained throughout the case.

¶ 3     The juvenile court entered a deferred adjudication and mother agreed to engage in a treatment plan.  One year later, the court adjudicated the child dependent or neglected.  The court adopted a treatment plan that required mother to (1) engage in parenting time and take parenting classes; (2) complete a combined mental health and substance abuse assessment and follow any recommendations, including substance abuse treatment and testing; (3) develop life skills; (4) maintain housing and employment; and (5) engage in case management.

¶ 4     Five months after adjudication, the Department moved to terminate mother's parental rights.  Mother was arrested three

months before the termination hearing and spent a little over a month in the Mesa County jail before being extradited to Texas.

¶ 5     Following a hearing, the court granted the motion and terminated mother's parental rights.

## II.     Termination Criteria and Standard of Review

¶ 6     A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the conduct or condition of the parent is unlikely to change within a reasonable time.  § 19-3-604(1)(c), C.R.S. 2024.

¶ 7     Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.  "We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they have record support."  *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.  We review de novo the juvenile court's legal conclusions,

including its determination as to whether the Department satisfied its reasonable efforts obligation. *See id.*; *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

¶ 8 It is for the juvenile court, as the trier of fact, to determine the sufficiency, probative effect, and weight of the evidence and to assess witness credibility. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

### III. Reasonable Efforts

#### A. Applicable Law

¶ 9 Before a court may terminate parental rights under section 19-3-604(1)(c), the county department of human services must make reasonable efforts to rehabilitate parents and reunite families. §§ 19-3-100.5(1), 19-3-208(1), 19-3-604(2)(h), C.R.S. 2024. "Reasonable efforts" means "the exercise of diligence and care" to reunify parents with their children. § 19-1-103(114), C.R.S. 2024.

¶ 10 Services provided in accordance with section 19-3-208 satisfy the reasonable efforts requirement. § 19-1-103(114). The services that "must be available and provided" as determined by individual case planning include, among others, screening, assessments, home-based family and crisis counseling, information and referral

3

services to assistance resources, family time, and placement services.  § 19-3-208(2)(b).  Additional services may be required if funding is available, including transportation, child care, diagnostic and mental health services, drug and alcohol treatment services, and family support services.  § 19-3-208(2)(d).

¶ 11    A parent's incarceration, in and of itself, does not excuse a department from making reasonable efforts.  *See* §§ 19-3-507(1)(f)(I), 19-3-508(1)(e)(III), C.R.S. 2024.

¶ 12    To evaluate whether a department made reasonable efforts, the court should consider whether the services provided were appropriate to support the parent's treatment plan.  *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011).  Whether a department made reasonable efforts "must be measured holistically rather than in isolation with respect to specific treatment plan objectives."  *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 35.  The parent is ultimately responsible for using the services provided to obtain the assistance needed to comply with the treatment plan.  *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).  The court may therefore consider a parent's unwillingness to participate in treatment when determining whether

a department made reasonable efforts. *People in Interest of A.V.*, 2012 COA 210, ¶ 12.

### B.    Analysis

¶ 13    Mother asserts that the Department did not make reasonable efforts because it failed to provide (1) family time while she was incarcerated and in inpatient treatment or (2) life skills services, parenting classes, or treatment aftercare throughout the case. We disagree.

¶ 14    The juvenile court concluded that the Department "made reasonable efforts to rehabilitate" mother and "to reunite this family." The court found that the Department provided mother "with multiple ways to contact the caseworkers, provided multiple options for services, helped reduce barriers to services, and set up regular meetings." Despite these efforts, mother was unsuccessful because "[f]or a substantial portion of the case, she was unreachable and uninvolved" and "never really tried."

¶ 15    The record supports the court's findings. The evidence established that:

- During the two years this case was open, three caseworkers attempted to contact mother via phone calls,

text messages, emails, and "face to face visits." But mother's communication was inconsistent, and the caseworkers were unable to locate her for most of the case. The only reliable form of communication for mother was email, but it would take a "very lengthy amount of time" before mother responded and she "never showed up to any . . . scheduled meetings" with the caseworkers.

- Caseworkers repeatedly authorized family time services at various agencies, but visits were often paused because mother could not be reached. The Department provided gas cards and bus passes to assist mother in attending family time and other appointments, but mother did not use them. At the time of the termination hearing, mother had not seen the child in over twenty months.

- The Department authorized substance abuse treatment, urinalysis testing, and an evaluation to assess mother's mental health and substance use. But mother did not complete the evaluation or any urinalysis testing. After failing twice to attend treatment arranged by the

6

Department, mother eventually completed a thirty-day program that she identified on her own. However after mother's discharge, the caseworker was unable to contact mother to arrange continuing treatment and mother relapsed.

- Mother testified that, in the three to four months leading up to her arrest, she "was living out in the desert, . . . was really bad in [her] addiction, and . . . completely stopped contact with everybody."

- The caseworker visited mother at the jail and encouraged mother to participate in jail-based behavioral treatment services.

¶ 16 True, the Department did not authorize family time for mother while she was in jail. But mother was arrested three months before the termination hearing, nearly two years after the case opened and a year-and-a-half since she had last seen the child. The third caseworker testified that, during a conversation at the jail, mother said that she "would like to be able to have some contact as far as sending letters, things of [that] nature throughout [the child's] life" but she did not ask for family time. Although mother testified that

7

she asked for family time, the court found that mother's "testimony was not particularly credible," and it is exclusively within the court's purview to resolve conflicting evidence. *See In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15; *A.J.L.*, 243 P.3d at 249-50.

¶ 17 Regarding family time during mother's inpatient treatment, the record shows that her stay occurred early in the case. At that time, the caseworker met with mother at the treatment facility and reauthorized family time. But the family time supervisor was subsequently unable to contact mother to schedule visits.

¶ 18 Although the Department did not make referrals for life skills, parenting classes, or treatment after mother's inpatient stay, nothing in the record suggests that had the caseworkers made referrals for these additional services, they would have made a difference in the outcome of the case given mother's lack of contact and participation. To that effect, the court found, with record support, that mother "was never really involved in the matter (and without her buy in there is only so much [the Department] can do)" and although "more could have been" done, it was nonetheless

"apparent that the failures of [mother] would have occurred regardless of any additional efforts of [the Department]."

¶ 19     In sum, the record supports the juvenile court's finding that the Department provided mother with the necessary resources to engage with her treatment plan when she could be located and maintained contact with the caseworkers, but that she did not take advantage of those resources. *See A.V.*, ¶ 12 (stating that, even under a heightened "active efforts" standard, futile efforts are not required).

## IV.   Less Drastic Alternatives

### A.     Applicable Law

¶ 20     Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives. *People in Interest of L.M.*, 2018 COA 57M, ¶ 24. In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3); *see L.M.*, ¶ 29. The court may also consider other factors, including the child's need for permanency. *L.M.*, ¶ 29.

¶ 21 For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, the less drastic alternative must be the "best" option for the child. *A.M.*, ¶ 27. If the court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. And under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

¶ 22 Additionally, when a child is under six years old, as here, the juvenile court must consider the expedited permanency planning provisions, which require that the child be placed in a permanent home as expeditiously as possible. *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2024.

### B. Analysis

¶ 23 Mother contends that the juvenile court erred by determining that no less drastic alternative to termination, such as placement with maternal grandfather, existed. We disagree.

¶ 24 The juvenile court considered less drastic alternatives to termination but found that "the family members who were identified

as placement either didn't respond to inquiries from [the Department], didn't pursue being placement for [the child] because they knew she was in a good place, or both." As to maternal grandfather, the court found that there was no indication "that he continued to be invested in the matter (as a placement) after he noticed the bond [the child] had developed with placement." The record supports the court's findings.

¶ 25 Early in the case, the Department's family search identified maternal grandfather, who lived in Nevada, as a potential placement provider. He was approved through the Interstate Compact on the Placement of Children; he attended five or six family engagement meetings; and he traveled to Grand Junction to visit the child. The caseworker testified that, after paternal grandfather and his wife observed the child's bond with her foster placement, "they withdrew their want to be placement because they didn't want to disrupt [the child's] attachment and bond that she had with placement." Paternal grandfather then stopped attending family engagement meetings and reached out to the Department only one more time.

¶ 26    Mother argues that paternal grandfather remained willing to be a placement provider throughout the case. True, paternal grandfather testified that he "never stated [he] never . . . wanted to be placement," and was still willing to be a placement provider at the time of the termination hearing. But the juvenile court found him "to be lacking in credibility." *See A.J.L.*, 243 P.3d at 249-50 (as the trier of fact, it is for the juvenile court to assess the credibility of witnesses).

¶ 27    The juvenile court also recognized mother's estrangement from her father as a barrier to placement, finding that mother "has a very broken relationship with her father (the person she would like the child placed with)." Paternal grandfather testified that mother did not "like to talk to me because me and her don't see eye to eye . . . she will not answer the phone . . . and she will not call me back . . . I still haven't got her address, and she still has not called me." Notably, paternal grandfather had no relationship with the child, having visited once.

¶ 28    The juvenile court found that the child "is extremely young" and "that permanency for [the child] is paramount." One of the caseworkers testified that the child had been in the same foster

placement for two years and needed permanency. And two caseworkers testified that termination was in the child's best interest.

¶ 29 The record supports the juvenile court's conclusion that further exploring maternal grandfather "as an option goes directly against [the child's] best interests, the legislative mandates, and would plainly be harmful to her." Because the record supports the court's findings, we must affirm its judgment. *See B.H.*, ¶ 81.

## V. Disposition

¶ 30 We affirm the judgment.

JUDGE LIPINSKY and JUDGE JOHNSON concur.