25CA0216 Peo in Interest of WMS 08-14-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0216
Montrose County District Court No. 23JV30006
Honorable D. Cory Jackson, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of W.M.S., a Child,

and Concerning W.R.S. and J.N.R.,

Appellants.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE TOW
Yun and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 14, 2025

---

Julie R. Andress, County Attorney, Montrose, Colorado, for Appellee

Jenna L. Mazzucca, Guardian Ad Litem

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant W.R.S.

James West, Office of Respondent Parents' Counsel, Longmont, Colorado, for Appellant J.N.R.

¶ 1     In this dependency and neglect proceeding, J.N.R. (mother) and W.R.S. (father) appeal the judgment terminating their parent-child legal relationships with W.M.S. (the child).  We affirm.

## I.     Background

¶ 2     The Montrose County Department of Human Services filed a petition in dependency and neglect regarding the child due to concerns about the parents' substance use and domestic violence. The juvenile court adjudicated the child dependent and neglected and adopted treatment plans for the parents.  Father moved to Ketchikan, Alaska, before the case opened and remained there for the duration of the case.

¶ 3     The child and father are enrolled members of the Ketchikan Indian Community (the KIC), which intervened in this case.  And because the child is an "Indian child" as defined by 25 U.S.C. § 1903(4), these proceedings were subject to the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963.

¶ 4     The child was placed with mother early in the case for a trial home visit, while the Department remained his legal custodian. Mother then took the child to Alaska without the Department's authorization.  Approximately two weeks later, the child was

returned to Montrose and placed in foster care. Mother came back to Colorado about three weeks after the child had returned. About eight months later, the child was placed with his paternal great-uncle in Texas.

¶ 5　　Later, the Department moved for termination. Following a three-day hearing held twenty months after the case opened, the court terminated mother's and father's parental rights.

## II.　Mother's Appeal

¶ 6　　Mother's sole contention is that the juvenile court lost jurisdiction over the matter "when she left for Alaska," and thus lacked jurisdiction to terminate her parental rights. We disagree.

### A.　Legal Framework and Standard of Review

¶ 7　　The Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) addresses subject matter jurisdiction, which a party may challenge for the first time on appeal. *See People in Interest of B.H.*, 2021 CO 39, ¶ 27. We review the juvenile court's subject matter jurisdiction de novo. *People in Interest of S.A.G.*, 2021 CO 38, ¶ 21.

¶ 8　　The UCCJEA sets out a comprehensive framework that Colorado courts must use to determine whether they may exercise jurisdiction in child custody matters. *People in Interest of C.L.T.*,

2017 COA 119, ¶ 16. And, significantly, "[t]he primary aim of the UCCJEA is to prevent competing and conflicting custody orders by courts in different jurisdictions that would put all parties at risk of uncertainty and unilateral removals of children from or to various jurisdictions." *People in Interest of M.M.V.*, 2020 COA 94, ¶ 17.

¶ 9 The UCCJEA offers courts two ways to exercise jurisdiction to make an initial child-custody determination — temporary emergency jurisdiction under section 14-13-204, C.R.S. 2024, and non-emergency jurisdiction under section 14-13-201, C.R.S. 2024. *S.A.G.*, ¶¶ 24-26. A Colorado court may exercise non-emergency jurisdiction to enter an initial child-custody determination if it successfully navigates one of the four paths to jurisdiction from section 14-13-201(1), including, as relevant here, home-state jurisdiction. *See S.A.G.*, ¶ 26.

¶ 10 A Colorado court has home-state jurisdiction if Colorado was "the home state of the child on the date of the commencement of the proceeding." § 14-13-201(1)(a). "Home state" means "the state in which a child lived with a parent or a person acting as a parent for at least one hundred eighty-two consecutive days immediately

before the commencement of a child-custody proceeding."
§ 14-13-102(7)(a), C.R.S. 2024.

## B. Application

¶ 11    While the juvenile court did not make a finding that Colorado was the child's home state when the proceeding commenced, no party disputes that Colorado was the child's home state at the time of the initial custody determination.  Nor does the record reveal that the child lived in any state other than Colorado or was subject to a prior custody order in any other state before the proceeding started.

¶ 12    Mother asserts, without citation to the record, that the court's jurisdiction ceased under section 14-13-202(1)(b), C.R.S. 2024, when the court "found that the child and parents no longer resided in Colorado."  *See* C.A.R. 28(a)(7)(B) (argument section of appellant's brief must contain citations to the parts of the record on which appellant relies).  But the court made no such finding.  Rather, the court acknowledged mother's self-report that she was in Alaska with father and directed the Department to facilitate the child's return to Colorado.

¶ 13    Having clarified that, we address what remains of mother's argument — that her departure from Colorado divested the court of

jurisdiction.  Mother acknowledges that her position is contrary to the Colorado Supreme Court's holding in *R.W. v. People in Interest of E.W.*, 2022 CO 51, but urges that we "revisit" this decision.

¶ 14    In *R.W.*, the Colorado Supreme Court determined that "[a] court that has obtained initial jurisdiction to adjudicate a child-custody proceeding under the UCCJEA does not automatically lose jurisdiction under section 14-13-202(b) by virtue of all parties leaving the state." *R.W.*, ¶ 24.  Rejecting the same argument mother makes here, the Colorado Supreme Court explained that the juvenile court "had properly acquired initial jurisdiction when the proceeding commenced, and it retained exclusive, continuing jurisdiction because no alternate state asserted a competing, valid claim." *Id.* at ¶ 21.  We are bound by this decision.  *See Willhite v. Rodriguez-Cera*, 2012 CO 29, ¶ 9 (The Colorado Supreme Court is "the final authority on questions of Colorado law."); *People v. Allen*, 111 P.3d 518, 520 (Colo. App. 2004) (The Court of Appeals is "bound by the decisions of the Colorado Supreme Court.").

¶ 15    In sum, mother and the child's mere brief absence from Colorado — unauthorized by the child's legal custodian — had no impact on the juvenile court's jurisdiction.  *See R.W.*, ¶ 24.

Accordingly, we reject mother's argument that her and the child's departure from Colorado divested the court of jurisdiction.[1]

### III. Father's Appeal

¶ 16 Father first contends that the juvenile court erred by concluding that the Department made active efforts to rehabilitate him and prevent the breakup of his family. He next contends that the Department failed to make active efforts to engage with possible kin placements and, as a result, failed to present sufficient evidence to show that termination was warranted "relative to a less drastic alternative." We address, and reject, each contention in turn.

### A. Active Efforts

#### 1. Legal Framework and Standard of Review

¶ 17 A juvenile court may terminate a parent's parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit;

---

[1] We also reject mother's contention that retaining the case in Colorado somehow deprived her of her statutory right to counsel.

and (4) the parent's conduct or condition is unlikely to change in a reasonable time.  § 19-3-604(1)(c), C.R.S. 2024.

¶ 18    In addition, ICWA requires that any party seeking termination of parental rights to an Indian child must "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d).  Active efforts require "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."  25 C.F.R. § 23.2 (2024).  A department must, at a minimum, "provide a parent with the services necessary to achieve each objective of the treatment plan" and "support the parents through the treatment plan goals."  *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 32.  The active efforts standard in ICWA cases is more demanding than the reasonable efforts standard applied in non-ICWA cases. *Id.* at ¶ 31.

¶ 19    Federal regulations include a non-exhaustive list of examples illustrating active efforts, including identifying appropriate services and "actively assisting the parents in obtaining such services";

7

inviting tribal representatives to participate in providing support and services to the family; contacting extended family members; offering culturally appropriate family preservation strategies; supporting regular family time; identifying community resources; and monitoring progress in services.  25 C.F.R. § 23.2.

¶ 20      Because "there is no one-size-fits-all formula," active efforts "should be 'tailored to the facts and circumstances of the case.'" *My.K.M.*, ¶ 32 (quoting 25 C.F.R. § 23.2).  As a result, a department has "discretion to prioritize certain services or resources to address a family's most pressing needs in a way that will assist the family's overall completion of the treatment plan." *Id.* at ¶ 33.  To that end, "[c]ourts should analyze an agency's active efforts by considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan." *Id.*  Likewise, a court should measure the department's efforts "holistically rather than in isolation with respect to specific treatment plan objectives." *Id.* at ¶ 35.

¶ 21      Whether a department satisfied ICWA's active efforts requirement presents a mixed question of fact and law.  *Id.* at ¶ 20. We review the juvenile court's factual findings for clear error but

review de novo whether those factual findings satisfy ICWA's active efforts requirement. *Id.*

### 2. Application

¶ 22 The juvenile court determined, based on the totality of the circumstances, that the "agencies . . . involved in this case took affirmative, active, thorough and timely steps to assist the respondents through the steps of the treatment plans, and therefore made active efforts." The court found that the Department's efforts went beyond mere referrals or encouragement but instead "included coordination between child protective agencies in different states, arranging services in different states, [and] providing supports for transportation." The court also relied on the expert testimony of the KIC's deputy tribal administrator, whom it designated as an ICWA qualified expert witness (QEW), and found the QEW's testimony was "very persuasive" regarding the active efforts made by the Department. *See* 25 U.S.C. § 1912(f) (requiring testimony of a QEW before the court may enter an order terminating parental rights in an ICWA case).

¶ 23 The record supports the court's findings.

¶ 24    Father's treatment plan required, among other things, that he engage in parenting education and address his mental health, anger, and substance use. In consideration of father's residence in Alaska, his treatment plan allowed services to be provided by the KIC. The record shows: (1) the Department coordinated with the KIC to identify the available services for father; (2) the caseworker located community providers; and (3) father could access all the necessary services locally through tribal or other community providers. *See* 25 C.F.R. § 23.2 (active efforts may include identifying community resources).

¶ 25    However, the caseworker and the social worker from the KIC struggled to reach father and had only minimal contact with him. For instance, the caseworker noted that the "[s]uccessful contacts" with father were limited to three to four calls during the fourteen-month period she had worked on the case. The caseworker and social worker therefore brainstormed "creative solutions for engagement," like "try[ing] to get [father] involved even if he wasn't wanting to talk to the Department." *See* 25 C.F.R. § 23.2 (active efforts may include helping parents overcome barriers to obtaining services). Without receiving verification from father

about his engagement in services, the caseworker reached out to the social worker to see if he had seen any engagement. Ultimately, father never verified his participation in any services or provided any signed releases to the Department.

¶ 26 The QEW testified that father was "well aware of what need[ed] to be done" on his treatment plan, but that in more than a year's time, he had not been able to get that completed. The QEW opined that while father had been provided the opportunity to complete the services offered, he was not successful in that endeavor. The QEW also opined that the Department had made active efforts. *See My.K.M.*, ¶¶ 37-45 (affirming the juvenile court's decision that the department made active efforts and relying, in part, on the QEW's opinion that the department had made active efforts, which was heavily credited by the juvenile court).

¶ 27 Still, father asserts that the Department did not do enough to assist him with accessing services, specifically suggesting that it did not accommodate his work schedule or help him overcome barriers to treatment. (Father testified that he worked in the concrete industry 365 days per year, with days beginning at 6:00 a.m. and ending at 6:00 p.m.) Yet, the social worker testified that all the

local programs were usually offered in the evening or at night to accommodate working parents, and that an online parenting class was available for father. Father never notified the caseworker of barriers to accessing services but maintained he would engage with services soon. And, crucially, when asked at the termination hearing why he had not completed the services required by his treatment plan, father testified that he believed "[mother] would figure out her stuff soon enough to where it would have made it to where I wouldn't have had to selfishly do any of this, and that's why nothing has been done on my end." Father essentially conveyed the same message to the caseworker during the case, admitting that he knew he had not been working on his treatment plan and that he had been counting on mother to do the work. Thus, it was father's own unwillingness to participate, rather than any alleged deficiency in the Department's efforts, that resulted in his lack of engagement in services. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12 (stating that "active efforts under the ICWA does not mean persisting with futile efforts," and noting that a court may "consider a parent's unwillingness to participate in treatment as a factor in determining whether the Department made active efforts").

¶ 28     Father next claims that the Department's efforts came up short because it did not offer "necessary modifications" (which he does not describe) that would have allowed him to consistently attend virtual visits, despite his demanding work schedule. The record indeed shows father did not consistently attend virtual visits. Father missed over a third of visits, was taken off the visitation schedule six times, used significantly less time than allotted for visits, and last saw the child over three months before the termination hearing. The caseworker testified that father would go through spurts of consistency with visits but then would "fall off the map" and be unreachable. While father claims it was too difficult for him to confirm visits at 6:00 a.m., he admitted at the hearing that he could have been checking in at that time, which coincided with the start of his workday. Accordingly, we are unpersuaded by father's claim concerning virtual visits.

¶ 29     Father also asserts the Department failed to coordinate in-person visits for him and the child in Alaska. True, the only in-person contact father and the child shared was during the brief period when the child was in Alaska during mother's unauthorized trip.

¶ 30    However, father never traveled to Colorado or Texas for in-person family time.  Moreover, for the child to visit Ketchikan from the child's placements in Colorado or Texas, the child, who was four years old when this case opened, would have had to fly first to Seattle and then to Ketchikan.  And the visits would have to be supervised because (1) father did not progress beyond supervised virtual visits and (2) according to the caseworker, it was not safe for father to have unsupervised visits due to ongoing concerns of domestic violence and substance use.  *See* 25 C.F.R. § 23.2 (active efforts includes supporting regular visits in the "most natural setting possible as well as trial home visits . . . consistent with the need to ensure the health, safety, and welfare of the child").  Similarly, the social worker testified that the KIC was concerned about domestic violence while the child was in Alaska.

¶ 31    Even so, father had access to virtual visits throughout the case but, as we described above, he missed visits often, used little of the allotted time, and was typically unreachable by the Department, despite its attempts.  *See A.V.*, ¶ 12 (noting that active efforts does not mean persisting with futile efforts).  Accordingly, we

are unpersuaded that the Department failed to make active efforts with respect to visitation.

¶ 32   Finally, father contends that the Department did not make active efforts because it did not adequately identify and engage with kinship placements. Assuming without deciding that the active efforts standard applies to placement, we disagree.

¶ 33   The Department initially identified the child's paternal great-uncle as a possible placement, and the KIC supported this placement. Paternal great-uncle was a member of the child's extended family, eligible for membership in the KIC, and a member of the Central Council of the Tlingit and Haida Indian Tribes. Therefore, paternal great-uncle (who the child was placed with at the time of termination) was a preferred placement under ICWA. *See* 25 U.S.C. § 1915(b) (enumerating placement preferences for Indian children in foster care, including "a member of the Indian child's extended family"); *see also People in Interest of A.R.*, 2012 COA 195M, ¶ 47 (noting that courts have interpreted this statute as "expressing a presumption that the child's best interests are served by placement with an extended family member who also has Indian heritage").

¶ 34 Further, the record reflects the Department's efforts to identify and locate family placements for the child:

- The Department sent out letters, talked to both parents, and requested two Interstate Compact on Placement of Children (ICPC) home studies, one of which was for paternal great-uncle.

- The other ICPC home study the Department requested was for a member of the KIC, who was like a sister to father, but the ICPC was denied due to her moving to a different state, and she did not reengage with the process thereafter.

- The Department and the KIC coordinated to investigate tribal placements while the child was in Alaska in an effort to allow him to remain there.

- The QEW spoke with community members to discern possible placements, including family members of paternal great-uncle.

We are not otherwise persuaded by father's claim that the Department did not adequately explore placement with paternal grandmother or grandfather. Both family members received letters inquiring about their interest in acting as a placement. Yet, father concedes that paternal grandfather refused to be a placement early

16

in the case, and nothing in the record suggests anyone recommended him as a placement thereafter. Moreover, while the Department and the KIC discussed paternal grandmother, the KIC did not support that placement due to a safety concern.

¶ 35 Thus, the Department's efforts, under the totality of the circumstances, demonstrate affirmative, active, thorough, and timely efforts to rehabilitate father's parental fitness and reunite him with the child as ICWA requires. *See My.K.M.*, ¶ 47.

### B. Less Drastic Alternatives

#### 1. Legal Framework and Standard of Review

¶ 36 Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must also consider and eliminate less drastic alternatives. *People in Interest of L.M.*, 2018 COA 57M, ¶ 24. In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3); *see L.M.*, ¶ 29. For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, the less drastic alternative must be the "best" option for the child. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 27. Therefore, if the court considers a less drastic

alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. Under those circumstances, we must affirm the court's decision if its findings are supported by the record. *B.H.,* ¶ 80.

### 2. Application

¶ 37 Father argues that as a direct result of the Department's deficient efforts to locate kinship placements, it presented insufficient evidence that termination was "preferable to placement with an Alaska relative and an [allocation of parental responsibilities] involving one or both parents."

¶ 38 However, we have already rejected father's argument that the Department made deficient efforts to engage with kin placements. *See* Part A.3. Further, we are unpersuaded by father's less drastic alternative arguments.

¶ 39 The juvenile court considered whether any less drastic alternative to termination existed and concluded that (1) termination was in the child's best interests, and (2) custody of the child with the parents would result in serious emotional or physical harm to him. *See* 25 U.S.C. § 1912(f). The court found

that "there [was] scant, if any, evidence" that an allocation of parental responsibilities (APR) "[wa]s an actual alternative in this case," and that permanency, which was long overdue for the child, could only be achieved by termination and adoption. *See People in Interest of Z.M.*, 2020 COA 3M, ¶ 30 ("Permanent placement is not a viable less drastic alternative if the child needs a stable, permanent home that can only be assured by adoption."); *see also L.M.*, ¶ 29 (noting that a juvenile court may consider the child's need for permanency when determining whether there is a viable less drastic alternative to termination).

¶ 40    The record supports the court's findings.

¶ 41    The caseworker, noting that the child had just turned six, opined that he "needs permanency and APR doesn't grant permanency that he is in desperate need of," but would instead "put him at risk for bouncing around again," and opined that the child "can't afford to continue to go through the same things he's been going through the past two years." Moreover, paternal great-uncle wished to adopt the child. *See Z.M.*, ¶ 31 (providing that the court may consider whether the placement favors adoption rather than an APR). And the court found, with record support, that the adoptive

family would "support and maintain the child's cultural ties to his tribal communities." Indeed, paternal great-uncle planned to travel to Alaska shortly after the termination hearing for the child to connect with his culture and visit with family. Finally, though father raises concerns that, at times during the case, paternal great-uncle was experiencing financial and marital struggles, the caseworker testified at the termination hearing that those issues had been resolved.

¶ 42 Lastly, to the extent father asserts the court could have granted an APR to paternal grandmother or grandfather, the KIC deemed placement with paternal grandmother inappropriate, and there was no indication paternal grandfather was an available placement.

¶ 43 Because the record supports the court's findings, we must affirm its determination. *See B.H.*, ¶ 80.

### IV. Disposition

¶ 44 The judgment is affirmed.

JUDGE YUN and JUDGE SULLIVAN concur.