25CA0352 Peo in Interest of R-GJM 11-06-25

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0352
Mesa County District Court No. 21JV236
Honorable Matthew D. Barrett, Judge

---

The People of the State of Colorado,

Appellee,

in the Interest of R-G.J.M., a Child,

and Concerning J.D-T.,

Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE JOHNSON
Grove and Welling, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 6, 2025

---

Todd M. Starr, County Attorney, Brad Junge, Assistant County Attorney, Grand Junction, Colorado for Appellee

Jenna L. Mazzucca, Guardian Ad Litem

Beth Padilla, Office of Respondent Parents' Counsel, Durango, Colorado, for Appellant

¶ 1     J.D-T. (father) appeals the juvenile court's judgment terminating his parent-child legal relationship with R-G.J.M. (the child).  We affirm.

## I.     Background

¶ 2     T.M. (mother) gave birth to the child while incarcerated.  At the time of the child's birth, paternity was not established.  Due to mother's custodial status and other concerns, the juvenile court granted emergency protective custody of the child to the Mesa County Department of Human Services (Department).  The Department placed the child in a kinship placement where he remained throughout the entire case.  The Department then filed a petition in dependency and neglect.

¶ 3     A year later, genetic testing confirmed father's paternity.  At that time, and throughout the remainder of the case, father was incarcerated.  His mandatory release date is in 2034.

¶ 4     The court subsequently adjudicated the child dependent and neglected.  Shortly after, the court adopted a treatment plan for father.

¶ 5 The Department later moved to terminate parental rights. The Department also moved for a finding that no appropriate treatment plan could be devised for father, which the court granted.

¶ 6 After an evidentiary hearing nearly two-and-a-half years after the petition was filed, the court terminated mother's parental rights but denied the motion as to father finding the Department had not made active efforts as required by the Indian Child Welfare Act (ICWA).[1] Following the hearing, the court adopted a second treatment plan for father.

¶ 7 Seven months later, the Department again filed a motion to terminate father's parental rights. Following a two-day evidentiary hearing, the court granted the motion.

## II. ICWA Compliance

¶ 8 Father asserts the juvenile court committed reversible error when it failed to follow ICWA provisions that require the court to, before ordering that the child be placed in foster care, (1) hold a foster care placement hearing; (2) place the child in a preferred

---

[1] The judgment terminating mother's parental rights was reversed on appeal by another division of our court in *People in Interest of R-G.J.M.*, (Colo. App. No. 24CA857, March 6, 2025) (not published pursuant to C.A.R. 35(e)).

placement; and (3) obtain testimony from an ICWA qualified expert witness — referred to as a QEW — that ongoing custody with a parent or Indian custodian would likely result in serious emotional or physical damage to the child.  We reject his contentions.

## A.    Additional Facts

¶ 9        Around the time the court adjudicated the child dependent or neglected as to mother, the Department learned that mother was an enrolled member of the Chippewa Cree of the Rocky Boy's Reservation (the Tribe).  In response to a Department inquiry, the Tribe said that the child was neither enrolled nor eligible for enrollment.  As a result, the court determined that the child was not an Indian child under ICWA.

¶ 10      But a year later, mother informed the Department that the child had become eligible for enrollment in the Tribe because of a change in the Tribe's membership requirements.  The child became an enrolled member effective January 4, 2024, and the child's tribal enrollment was filed with the court on March 28, 2024.

¶ 11      The Tribe was notified of both the first termination and second termination hearings.  And a QEW testified during both proceedings.

## B, Standard of Review and Applicable Law

¶ 12    Whether a juvenile court complied with ICWA is a question of law that we review de novo. *In re Marriage of Stockwell and Dees*, 2019 COA 96, ¶ 11.

¶ 13    For ICWA to apply in a dependency and neglect proceeding, the case must involve an Indian child. *See People in Interest of A G.-G.*, 899 P.2d 319, 321 (Colo. App. 1995). ICWA applies when an Indian child is the subject of a "child custody proceeding." 25 C.F.R. § 23.103(a). A "child custody proceeding" is defined as a foster care placement, a proceeding to terminate parental rights, or a preadoptive or adoptive placement. 25 U.S.C. § 1903(1). ICWA also applies to an action that may result in one of these placement outcomes, even if it ultimately does not. *See* 25 C.F.R. § 23.2 (2025).

## C.    Preservation

¶ 14    We disagree with the Department and Guardian ad Litem (GAL) that father's ICWA contentions were not preserved. On the same day that documentation of the child's tribal enrollment was filed with the juvenile court — March 28, 2024 — the court held a hearing in which father's counsel argued that the court must hold a

4

placement hearing to ensure the child is in a preferred placement and to hear testimony from the QEW that there would be serious injury if the child was placed with either parent. Father's counsel made these arguments as not just "procedural matters," but said that they must be addressed as "due process issues."

### D. Foster Care Placement Hearing

¶ 15 Father asserts the juvenile court erred when it failed to hold a foster care placement hearing after learning the child was an Indian child. We reject father's argument.

¶ 16 For almost two years, the juvenile court did not have reason to know the child was an Indian child because the Tribe had explicitly reported the child was not enrolled and was not eligible to be enrolled. Once the court learned the child was eligible, the next scheduled child custody proceeding was the first termination hearing. The Tribe received notice of the termination hearing and it participated in that proceeding through a QEW. *See* 25 U.S.C. § 1903(1) (defining child custody proceedings under ICWA).

¶ 17 Additionally, the record shows the Tribe supported the child's placement. When the Tribe first became involved in the case, a tribal representative reported to the caseworker that if the Tribe did

5

take over the case, the child would likely not move from placement because he had been in a kinship home from birth. The Tribe continued to support the child's placement through the first and second termination hearings.

¶ 18    Thus, we conclude that, even if the court did not hold a hearing that dealt solely with foster care placement, the court held proceedings consistent with the requirements of ICWA for foster care placement after court learned the child became eligible for tribal enrollment.

### E.    ICWA Placement Preferences

¶ 19    Father next asserts the child was not in a preferred placement because he was not placed with a member of his extended family, other members of the Tribe, a foster home approved by the Tribe, another Indian family or foster home, or an institution approved by the Tribe. *See* 25 U.S.C. § 1915(a)-(b). ICWA defines "extended family" as either "defined by the law or custom of the Indian child's tribe," or in the absence of such, "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or

nephew, first or second cousin, or stepparent." 25 U.S.C. § 1903(2). We reject father's argument.

¶ 20 The child was placed with a maternal half-sibling. At the first termination hearing, the QEW testified that the child's placement was appropriate given that the child was placed with a sibling, thereby a member of his extended family as defined under ICWA, and the placement met the child's needs. Thus, the court did not err when it found the child was in an ICWA preferred placement.

## F. QEW Testimony

¶ 21 Finally, father argues that the court erred when it terminated his parental rights because the QEW did not explicitly testify that ongoing custody with one of the parents would result in serious emotional or physical damage to the child. *See* 25 U.S.C. § 1912(f); *see also People in Interest of D.B.*, 2017 COA 139, ¶ 14.

¶ 22 But evidence established that the QEW believed the child would face serious emotional or physical damage if he was in the parents' custody. At the first termination hearing, the QEW testified that she believed father could not parent while incarcerated and that the child would be at risk if he remained in the care of a

7

parent. At the second termination hearing, a second QEW testified much the same.

¶ 23 We acknowledge that the second QEW did not explicitly say that ongoing custody with father would result in damage to the child. But the second QEW opined that the child's visits with father were detrimental, that she had concerns about father's ability to parent, and that termination was in the child's best interests.

¶ 24 Thus, the second QEW's testimony demonstrates that she did not support ongoing custody with father because of the emotional harm it would cause to the child. Considering this, we conclude the court did not err.

### III. Active Efforts

¶ 25 Father next argues the Department failed to make active efforts to prevent the breakup of his Indian family while he was incarcerated. We are not persuaded.

### A. Standard of Review and Applicable Law

¶ 26 Whether the Department made active efforts is a mixed question of fact and law. *People in Interest of A.V.*, 2012 COA 210, ¶ 13. We review the juvenile court's factual findings for clear error and its legal conclusions de novo. *Id.* The credibility of the

8

witnesses, and the sufficiency, probative effect, and weight of the evidence, and the inferences and conclusions to be drawn from it, are within the juvenile court's discretion. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

¶ 27     Under ICWA, a party seeking to terminate parental rights to an Indian child must satisfy the court that (1) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family; and (2) those efforts have been unsuccessful. 25 U.S.C. § 1912(d); *People in Interest of A.V.*, 2012 COA 210, ¶ 7. Active efforts require "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 C.F.R. § 23.2. Active efforts are "a more demanding standard than the reasonable efforts standard applied in non-ICWA cases." *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 31; *see* § 19-1-103, C.R.S. 2025 (defining "reasonable efforts"); § 19-3-208, C.R.S. 2025 (listing services that must be provided to satisfy "reasonable efforts").

¶ 28     At a minimum, active efforts require an agency to identify and secure the resources and services parents need to successfully

9

satisfy treatment plan objectives and to support the parents through the treatment plan. *My.K.M.*, ¶ 32.

¶ 29     We analyze a department's active efforts "by considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan." *Id.* at ¶ 33. In doing so, we measure a department's efforts "holistically rather than in isolation with respect to specific treatment plan objectives." *Id.* at ¶ 35. Ultimately, active efforts "should be 'tailored to the facts and circumstances of the case.'" *Id.* at ¶ 32 (quoting 25 C.F.R. § 23.2).

### B.     Analysis

¶ 30     Father argues the Department should have set up mental health and substance abuse evaluations for him and that it failed to provide active efforts when it did not provide him with necessary services, such as a psychological evaluation and substance abuse treatment.

¶ 31     Although the juvenile court did not make specific factual findings, it found "beyond a reasonable doubt that the Department engaged in active efforts to reunify [the] family." There is record support for the court's findings.

¶ 32    The record shows that the Department of Corrections' (DOC) noncooperation and father's lack of compliance prevented him from accessing services, not the Department's lack of active efforts.  In support, two caseworkers testified about the difficulty they had in attempting to connect with father's case manager at the DOC to see what services were available to him.  The caseworker also suggested sending books for father to read to the child during virtual family time, but the facility denied the request.  The caseworker routinely requested that father give her information on the services available to him and who provided those services, but he never replied with that information.  The caseworker then searched for the information herself, using old financial reports and an online handbook for the facility, to create father's treatment plan in line with services available to him.

¶ 33    Father asserts the caseworker should have driven to the facility to see his case manager in person, but the caseworker reported the case manager would not answer requests for meetings.  Father also argues the caseworker should have offered referrals or services for substance abuse but does not explain how the Department would have forced the DOC to enact those services.

And he maintains that the caseworker should have sent father books "about parenting in prison, substance abuse recovery, child development, educational materials about children, and how to co-parent with someone that has mental health issues," but the record is devoid of father making any such requests.

¶ 34 The record also shows that the caseworker was unable to facilitate any mental health services for father because father's case manager reported mental health services must be initiated by the inmate due to Health Insurance Portability and Accountability Act regulations, and father never did so. While father reported he attended substance abuse and anger management classes, the caseworker was unable to verify his attendance and father never provided certificates showing he had completed them.

¶ 35 Father completed a Seven Habits of Highly Effective People class and a parenting class but was unable to describe how he was able to incorporate what he learned into his life. He reported he did not write any letters to the child, as required by his treatment plan, because he did not "want to say the wrong things."

¶ 36 Yet, father contends the Department should have facilitated in-person family time for him while he was incarcerated. The

record shows the Department did not conduct in-person family time visits because of concerns that the visits would be detrimental to the child. The therapeutic family time supervisor opined that transporting the child to the prison for in-person family time would be "even more distressing to [the child] than" virtual visits already were and that increasing visits would only be damaging to the child. The caseworker testified that in-person family time would require an eight-hour round trip car ride, which she did not believe was in the child's best interests. And the Tribe would not support any in-person visits to the DOC because the Tribe believed it would cause more trauma to the child.

¶ 37 While there was a delay in setting up virtual family time after the first termination hearing, the Department was able to facilitate twice-monthly visits between father and the child for the remainder of the case. The child reportedly exhibited emotional dysregulation related to the family time that caused the visits to end early and impacted his behavior outside of family time.

¶ 38 Finally, based on a review of the entire case, including the type and number of father's visits, the QEW opined that the Department had made active efforts to prevent the breakup of the Indian family.

13

The court found this testimony credible. To the extent father argues that the witness was not reliable given the length of time she had been on the case, credibility determinations are for the juvenile court, and not us, to make. *See A.J.L.*, 243 P.3d at 249-50.

¶ 39 Considering the totality of the circumstances, we are unpersuaded that the Department failed to make active efforts to provide father with services to reunite him with his child. *See My.K.M.*, ¶ 12. Therefore, we decline to disturb the court's judgment.

## IV. Less Drastic Alternatives

¶ 40 Father contends that the juvenile court erred by finding that there were no less drastic alternatives to termination.

¶ 41 Standard of Review and Applicable Law

¶ 42 We review a court's finding of whether there is a less drastic alternative to termination and in the child's best interest for clear error. *A.M. v. T.M.*, 2021 CO 14, ¶¶ 15, 44.

¶ 43 A juvenile court must consider and eliminate less drastic alternatives before it terminates the parent-child legal relationship. *People in Interest of A.M. v. T.M.*, 2021, ¶ 40. In considering less drastic alternatives, the court must base its decision on the best

interests of the child, primarily considering the child's physical, mental, and emotional conditions and needs. § 19-3-604(3), C.R.S. 2025.

¶ 44   For a less drastic alternative to be viable, it must do more than "adequately" meet the child's needs; rather it must be in the child's best interests. *A.M.*, ¶ 27. Therefore, if a juvenile court considers a less drastic alternative, but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. And under those circumstances, we must affirm the court's decision if the court's findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 81.

## A.    Analysis

¶ 45   The juvenile court found that alternative placements had been considered and rejected, that termination was in the child's best interests, and that no less drastic alternatives existed. The court further found that the child's need for permanency was "paramount," that he was doing well in his kin placement, and removing the child from his placement would be "extremely detrimental to him and for reasons that don't outweigh his best interests." The record supports the court's findings.

15

¶ 46    The caseworker testified that at the beginning of the case father gave the Department only three alternative placement options to investigate — paternal grandmother, father's wife, and paternal aunt.  The caseworker reported that paternal grandmother and father's wife declined to be placement options.  Paternal grandmother was also later excluded due to her own child welfare history.  Paternal aunt expressed an interest in being a placement but ultimately failed to reply to the caseworker's calls and home study inquiry attempts.  Maternal grandfather was previously investigated as well, and he reported he did not want to be a placement.  While he later changed his mind, the Department was unable to place the child in his care because mother lived with him and at the time her rights had been terminated.

¶ 47    The therapeutic family time supervisor testified that there would be serious emotional harm to the child should his placement be disrupted.  One caseworker testified that she did not believe it was in the child's best interests to remove him from his current placement.  A second caseworker testified that she believed that father viewed obtaining custody of the child "more of like a – a possession than it is like actually caring for another human being,"

16

which suggests that father was not taking into consideration what might be in the child's best interest. And a third caseworker testified that she believed the longer the case dragged on the worse it was for the child, and that she also believed termination was in the child's best interests.

¶ 48 The QEW opined that the child's placement was an appropriate kinship placement, and that the Tribe believed termination was in the child's best interests. She further testified that the Tribe would not support removing the child from his current placement as the Tribe believed it could be detrimental to his well-being.

¶ 49 Father argues that the Department did not thoroughly investigate paternal relatives as potential placement options. But, as mentioned above, the Department investigated four relatives identified early on. In addition to the above listed relatives, father identified his half-sister, his previous foster mother, foster mother's daughter, a maternal aunt, and a paternal cousin as placement options in his relative affidavit. At the second termination hearing. a caseworker testified that she was ultimately able to get in touch with all these candidates. The caseworker further reported that

17

numerous relatives contacted the Department seeking placement but would then not engage in meetings to further discuss what transitioning the child would look like.

¶ 50     Father also contends the Department delayed investigating all the relatives listed on his relative affidavit. This is true, and the Department's failure to timely consider other relatives is troubling. For reasons unknown, the Department did not contact father's half-sister, his previous foster mother, foster mother's daughter, a maternal aunt, and a paternal cousin until after the first termination hearing. Nonetheless, as mentioned above, the Department was able to get in touch with all potential placements. At the second termination hearing, father's former foster mother and half-sister each expressed an interest in being a placement option but both conceded that they did not reach out to the Department until after the first termination hearing. Father's former foster mother testified that she had no concerns about removing the child from placement and a sibling he had been with his entire life and believed it was in the child's best interests for the child to wait six to eight years for father to be released "because it's [the child's] father." While father's half-sister did have concerns

about moving the child, she testified she would return the child to father when he was released.

¶ 51    The court considered this testimony and found that "the focus from both potential placements seems to be that the risk to [the child] is worth it for the purpose of keeping the family unit together" and that "whatever emotional trauma might come to [the child] by being taken from the only home he's ever known . . . is worth it," in the hopes that when father is released from prison he "will be the parent and person that everyone wants him to be" when he had never before shown an ability to parent.  The court found that it was not in the child's best interests.

¶ 52    While the Department may have failed to promptly investigate other paternal kin and kin-like relatives, such omission does not, under the facts and circumstances of this case, constitute a basis for reversal of this termination order.  Here, substantial evidence in the record supports the court's finding that removing the child from his placement would not be in his best interests and that father had not made meaningful progress as of the termination hearing. Further, the child was in a kinship home supported by the Tribe and was under the age of six at the time and needed immediate

permanency.  §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025; *see also People in Interest of S.Z.S.*, 2022 COA 133, ¶ 25. Thus, based upon the foregoing, we conclude the court did not reversibly err in finding no less drastic alternatives to termination existed.

## V.    Conclusion

¶ 53    The judgment is affirmed.

JUDGE WELLING and JUDGE GROVE concur.